**UNITED STATES of America**

v.

**Dennis E. PRYBA, Appellant.**

**No. 24788.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 2, 1971.

Decided July 29, 1974.

Stanley M. Dietz, Washington, D. C., for appellant.

C. Madison Brewer, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, DANAHER, Senior Circuit Judge, and ROBINSON, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

On this appeal, we are summoned to review appellant's conviction of interstate transportation of obscene matter [1] and possession of such matter with intent to disseminate.[2] Following indictment and a nonjury trial culminating in the findings of guilt, the trial judge imposed but suspended a one- to three-year sentence of imprisonment on the transportation count and levied a general $1,000 fine on the two counts.[3] Our study of appellant's several contentions in light of the record and the evolving judicial precedents [4] reveals no error. We accordingly affirm.

## I

The events foreshadowing this prosecution began at San Francisco International Airport one evening when a man identifying himself as Tom Moore [5] sought to ship a paper-wrapped box via United Airlines to appellant in Washington, D. C.[6] When an air freight clerk, Rex Feight, inquired as to the contents of the box, Moore first claimed he did not know;[7] when Feight explained why the airline needed the information,[8]

1. 18 U.S.C. § 1462 (1970), in relevant part providing:

> Whoever brings into the United States, or any place subject to the jurisdiction thereof, or knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—
> (a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character; or . . .
> Whoever knowingly takes from such express company or other common carrier any matter or thing the carriage of which is herein made unlawful—
> Shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter.

2. D.C.Code § 22–2001 (1970), in relevant part providing:

> (a)(1) It shall be unlawful in the District of Columbia for a person knowingly—
> (A) to sell, deliver, distribute, or provide, or offer or agree to sell, deliver, distribute, or provide any obscene, indecent, or filthy writing, picture, sound recording, or other article or representation; . . .
> (E) to create, buy, procure, or possess any matter described in the preceding subparagraphs of this paragraph with intent to disseminate such matter in violation of this subsection; . . .
> (e) A person convicted of violating subsection (a) or (b) of this section shall for the first offense be fined not more than $3,000 or imprisoned not more than one year, or both. A person convicted of a second or subsequent offense under subsection (a) or (b) of this section shall be fined not less than

$1,000 nor more than $5,000 or imprisoned not less than six months or more than three years, or both.

3. But see United States v. Straite, 138 U.S. App.D.C. 163, 165, 425 F.2d 594, 596 (1970), with which compare United States v. Maude, 156 U.S.App.D.C. 378, 394–395, 481 F.2d 1062, 1078–1079 (1973). No objection has been raised on this account.   •

4. We deferred consideration of several of the issues involved to enable their resolution in light of forthcoming decisions of the Supreme Court in a series of cases then pending, including United States v. Twelve 200-Ft. Reels, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); Heller v. New York, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973); and Roaden v. Kentucky, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). Compare Huffman v. United States, 152 U.S.App.D.C. 238, 256–258, 470 F.2d 386, 404–406 (1972) (opinion on rehearing); see Parts II–V, infra. We have also had the benefit of the Court's very recent decisions in Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), and Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 640 (1974).

5. That that was his real name was never verified because the address he gave as consignor turned out to be fictitious and he could not be found. See note 13, infra.

6. Moore was designated as consignor with a San Francisco address, and appellant as consignee with a Washington address.

7. Although he had named himself as consignor.

8. Feight testified:
> [A]s is normal, we asked the shipper what he was shipping. That's because of being

Moore paced about for "a couple of minutes" and suggested reluctantly that the box contained "something personal." [9] After further discussion, it was decided that the shipment would be described as "personal effects."

His suspicion aroused by Moore's curious behavior,[10] Feight later turned the box over to his supervisor, Robert G. Miller, who opened it [11] and found 30 unpackaged reels of 8-millimeter color movie film bearing titles unsubtly suggesting sex.[12] Miller held portions of two films up to the light and on one saw nude males, and on the other nude males and females, engaging in sexual acts. Miller then notified the Federal Bureau of Investigation, and an agent was sent to Miller's office with a projector. After viewing two more films, which depicted both heterosexual and homosexual activity, Miller repacked the films in the box and placed the box back in transit.

On the next morning the box was shipped to Washington on a United Airlines flight, and on the day thereafter was delivered at the Potomac News Company in Southeast Washington, the address listed on the wrapping with appellant's name as consignee. Meanwhile, on the basis of information relayed by the FBI office in San Francisco,[13] agents in Washington obtained a warrant authorizing a search at the Potomac News Company for the films.[14] The warrant was executed immediately, and the box of films was seized when an employee of the Potomac News Company removed it from above the ceiling tiles in appellant's office, where it had been concealed. Inside the box were 30 reels exhibiting 15 separate titles,[15] and the paper wrapping and material used for interior packing were recovered from a trash can in appellant's office.

Five days later, the parties were convened, at the Government's request, for an adversary hearing in the District Court to determine whether the films

---

an air carrier, naturally we have to be alert for the acceptance possibly of dangerous articles or possibly shipments of an illegal nature . . . . We do have to have a commodity description so that we know it is an acceptable type of commodity that is being shipped . . . . So I told him that we have to know what is being shipped so that we can tell whether it is an acceptable type of commodity that we are going to ship so as to prevent any acceptance of any dangerous or illegal type of shipment . . . . I advised him that we would have to know what he was shipping, we just could not accept it unless we knew what we were shipping.

9. Feight further testified:
And he became very reluctant, in my opinion, to tell me what was being shipped, which began to arouse my suspicion of the transaction, as to whether it was something that we could accept. And he sort of shied back away from the counter and walked around a little bit while I was trying to determine what he was shipping. And after, oh, probably a couple of minutes' time, he came up with the suggestion well, it was something personal.

10. Feight said he "was suspicious [that the box] contained something else than described [in the air bill], and my first thought was that it would be narcotics."

11. By then, Moore had left. Feight explained at trial:
I was considerably busy at the time [Moore presented the box]. We had quite a lobby full of people, there were more customers waiting. So after accepting the shipment and giving the shipper his copy of the air bill, I placed the shipment on the floor behind me, and went ahead and helped, oh, approximately two or three other customers, I don't recall exactly how many. And then after the customers were mostly all taken care of, I returned to that shipment from Tom Moore and started to process it . . . .

12. See note 15, *infra.*

13. In addition to the events at the San Francisco airport, the information communicated included the subsequently-ascertained fact that the address listed for Tom Moore was fictitious. The man who identified himself by that name was never found.

14. The affidavit upon which the search warrant was issued is reproduced in the appendix to this opinion.

15. As later discovered, there were two copies of each of 13 titles, three copies of another title, and one copy of still another title, each copy bearing a label stating its title.

were obscene.[16] Appellant's counsel stood on his position that a judicial determination on obscenity should have preceded the seizure of the films; he offered no opposition to the Government's claim of obscenity, but merely "acquiesced" in the proceeding. Two of the films were viewed by District Judge Gasch, who adjourned the hearing upon conviction that a specific ruling was unnecessary.[17] An indictment followed, charging appellant and others [18] with the violations in suit.

Before trial, appellant moved to suppress the films on the grounds that the examination of the box by the United Airlines' freight supervisor violated the Fourth Amendment; [19] that the affidavit in support of the search warrant was insufficient to establish probable cause; [20] and that seizure of the films without prior judicial ascertainment of their obscenity at an adversary hearing was unlawful.[21] The motion was heard by District Judge Pratt,[22] who by written opinion denied it.[23] The charges against appellant's codefendants were dropped, appellant waived a jury trial, and the case proceeded.

At the trial, before Judge Pratt, the Government's evidence traced appellant's arrangements to obtain the films from a party in California,[24] their delivery to United Airlines by Tom Moore, the investigation at the San Francisco airport and the seizure of the films at the Potomac News Company. Two of the films were shown to Judge Pratt; the parties stipulated, and an FBI agent who had viewed all of the films testified, that those two were typical of the others.[25]

Appellant introduced no evidence, but rested upon a motion for a judgment of acquittal for alleged insufficiency of the evidence to legally sustain conviction on either of the two counts of the indictment.[26] Judge Pratt rejected these contentions and, satisfied beyond a reasonable doubt as to the films' obscenity and appellant's offensive relationship

16. See Part III, *infra.* The Government was prepared to participate in such a hearing on the day following the search. The unavailability of appellant's counsel on that day—a Friday—and the intervention of the weekend were chiefly responsible for the short delay.

17. This, the record makes plain, because of appellant's manifest disinterest in such a ruling. See note 25, *infra.*

18. The Potomac News Company and another of its representatives.

19. See Part II, *infra.*

20. See Part II, *infra.*

21. See Part III, *infra.*

22. The presentations at the hearing, almost entirely argumentative, were directed at the facial sufficiency of the affidavit underlying the warrant. The only testimony introduced related to execution of the search warrant.

23. United States v. Pryba, 312 F.Supp. 466 (D.D.C.1970).

24. Previously, on a trip to California, appellant had viewed three films in the seller's private collection, but had declined to take any of the films. Three weeks later in Washington, expressing the feeling that "it would be all right to have" the films, appellant ordered two copies of each of 15 titles, one copy for himself and the other for his attorney. It seems clear that, through error of the seller, three copies of one reel but only one copy of another reel were shipped. Appellant declined the seller's offer to supply additional copies, informing the seller that he wanted the films for his private collection and not for resale. There was uncontradicted testimony that the Potomac News Company does not deal in hard-core pornography.

25. Neither in the District Court nor here has appellant disputed the Government's claim that the films are obscene. The two films shown Judge Pratt at trial, and earlier shown Judge Gasch, were described for the record, and the description puts their obscenity beyond peradventure of a doubt. See Miller v. California, 413 U.S. 15, 24–26, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Counsel for the adversaries concurred in the record description, as did Judge Pratt, and it was established both by stipulation and testimony that the two films shown were typical of the others. Judge Pratt expressly found that "the two films stipulated to be typical of the group are something more than mere obscenity, they are hard-core pornography," and the description fully sustains that conclusion. With obscenity proven so solidly and not at all in issue, we can spare our readers further descriptive details.

26. See Parts IV–V, *infra.*

to them,[27] found him guilty on both counts.

Appellant's bid for reversal of his conviction is four-fold. He argues that United Airlines' examination of the box in San Francisco and the FBI's seizure of the films in Washington were unlawful invasions of Fourth Amendment rights.[28] He also asserts that the seizure was invalid for the additional reason that there was no prior adversary hearing culminating in a judicial determination that the films were in fact obscene.[29] Additionally, he claims that the statute underlying the charge of interstate transportation of obscene matter[30] is unconstitutional as applied to an adult receiving such matter for his own private use or for non-commercial exhibition.[31] And he further contends that the statute outlawing possession of obscene matter with intent to disseminate[32] is unconstitutional as applied to possession by an adult with a view to non-commercial distribution to another consenting adult without obtrusive advertising or pandering.[33] We consider, in that order, each of these

arguments[34] and, for reasons to be stated, we find none of them persuasive.

## II

We first address appellant's Fourth Amendment claims—challenges both to United Airlines' inspection of the box at the San Francisco airport and the search of Potomac News Company's premises in Washington. Appellant contends that the airline's freight supervisor was constitutionally forbidden to open the box or to examine the films enclosed therein.[35] Appellant further contends that the affidavit supporting the subsequently-issued search warrant was constitutionally deficient because it alleged facts communicated to and not personally known by the affiant.

### A. The San Francisco Search

The Fourth Amendment lays its proscriptions[36] upon exertions of federal authority.[37] By the Due Process Clause of the Fourteenth Amendment, the same restraints are imposed upon exercises of state power.[38] But, the Supreme Court holds, individual conduct devoid of governmental sanction is beyond the pur-

---

27. See note 25, *supra*, and Parts IV–V, *infra*.

28. See Part II, *infra*.

29. See Part III, *infra*.

30. 18 U.S.C. § 1462 (1970), quoted in relevant part *supra* note 1.

31. See Part IV, *infra*.

32. D.C.Code § 22–2001 (1973), quoted in relevant part *supra* note 2.

33. See Part V, *infra*.

34. We limit our consideration, of course, to questions which were presented to the District Court and raised again in this court. See Brown v. Collins, 131 U.S.App.D.C. 68, 72, 402 F.2d 209, 213 (1968) ; American Air Export & Import Co. v. O'Neill, 95 U.S. App.D.C. 274, 276, 221 F.2d 829, 831 (1954) ; Rone v. Rone, 78 U.S.App.D.C. 369, 141 F.2d 23 (1944) ; Minnesota Mining & Mfg. Co. v. Coe, 73 App.D.C. 146, 148, 118 F.2d 593, 595 (opinion on rehearing), cert. denied, 314 U.S. 624, 62 S.Ct. 89, 86 L.Ed. 501 (1941).

35. A related argument is that the films, once questioned, should have been exhibited to a judicial officer in San Francisco conjunctively with an application for a warrant enabling their immediate seizure. See note 59, *infra*.

36. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. Amend. IV.

37. *E. g.*, Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) ; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ; Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

38. *E. g.*, Terry v. Ohio, 392 U.S. 1, 8, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968) ; Ker v. California, 374 U.S. 23, 30, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) ; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

view of either Amendment.[39] Courts honor the distinction between governmental and individual action, as they must, in their dealings with searches by air carriers for contraband.[40]

■ Where the search is made at the behest of or with the assistance of law enforcement officers, there must be probable cause, and in appropriate instances an authorizing warrant, if the search is to pass constitutional muster.[41] But where the search is made on the carrier's own initiative for its own purposes, Fourth Amendment protections do not obtain for the reason that only the activities of individuals or nongovernmental entities are involved.[42] So frequently and so emphatically have the courts enunciated and applied these principles[43] that, at least for the time being, they must be regarded as settled law.[44]

This body of doctrine would, of course, immunize United Airlines' inspection of the box from appellant's attack. Appellant points, however, to Rule 24 of Civil Aeronautics Board Regulation 96, which provides in part that "[a]ll shipments are subject to inspection by the carrier."[45] Appellant then asserts that Rule 24 was the assumed source of the airline's authority to open

39. Burdeau v. McDowell, 256 U.S. 465, 475–476, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). See also Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Accord, United States v. McGuire, 381 F.2d 306, 312–314 & n. 5 (2d Cir. 1967), cert. denied, 389 U.S. 1053, 88 S.Ct. 800, 19 L.Ed.2d 848 (1968); United States v. Goldberg, 330 F.2d 30, 35 (3d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); Barnes v. United States, 373 F.2d 517, 518 (5th Cir. 1967). See note 40, infra.

40. See United States v. Parish, 152 U.S. App.D.C. 72, 81 & n. 61–62, 468 F.2d 1129, 1138 & n. 61–62 (1972), cert. denied, 410 U.S. 957, 93 S.Ct. 1430, 35 L.Ed.2d 690 (1973); United States v. McGuire, supra note 39, 381 F.2d at 313–314 n. 5; United States v. Goldberg, supra note 39, 330 F.2d at 35.

41. Corngold v. United States, 367 F.2d 1, 4–6 (9th Cir. en banc 1966); People v. McGrew, 1 Cal.3d 404, 82 Cal.Rptr. 473, 478, 462 P.2d 1, 7 (1969), cert. denied, 398 U.S. 909, 90 S.Ct. 1689, 26 L.Ed.2d 67 (1970). See also Stapleton v. Superior Court, 70 Cal.2d 97, 73 Cal.Rptr. 575, 577–578, 447 P.2d 967, 969–970 (1968); Moody v. United States, 163 A.2d 337, 339–340 (D.C.Mun.App.1960); Machlan v. State, 248 Ind. 218, 225 N.E.2d 762, 763–765 (1967); State v. Scrotsky, 39 N.J. 410, 189 A.2d 23, 24–26 (1963).

42. United States v. DeBerry, 487 F.2d 448, 450 (2d Cir. 1973); United States v. Cangiano, 464 F.2d 320, 324–325 (2d Cir. 1972), vacated on other grounds, 413 U.S. 913, 93 S.Ct. 3047, 37 L.Ed.2d 1023 (1973); United States v. Blum, 329 F.2d 49, 52 (2d Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045 (1964); United States v. Val-en, 479 F.2d 467, 469–470 (3d Cir. 1973); United States v. Blanton, 479 F.2d 327 (5th Cir. 1973); United States v. Echols, 477 F.2d 37 (8th Cir.), cert. denied, 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973); United States v. Burton, 475 F.2d 469, 471 (8th Cir.), cert. denied, 414 U.S. 835, 94 S.Ct. 178, 38 L.Ed.2d 70 (1973); United States v. Tripp, 468 F.2d 569 (9th Cir. 1972), cert. denied, 410 U.S. 910, 93 S.Ct. 965, 35 L.Ed.2d 272 (1973); Clayton v. United States, 413 F.2d 297, 298 (9th Cir. 1969), cert. denied, 399 U.S. 911, 90 S.Ct. 2204, 26 L.Ed.2d 565 (1970); Wolf Low v. United States, 391 F.2d 61 (9th Cir.), cert. denied, 393 U.S. 849, 89 S.Ct. 136, 21 L.Ed.2d 119 (1968); Gold v. United States, 378 F.2d 588, 590–591 (9th Cir. 1967); United States v. Harding, 475 F.2d 480, 483–484 (10th Cir.), vacated on other grounds, 414 U.S. 964, 94 S.Ct. 274, 38 L.Ed.2d 211 (1973). See also United States v. Wilkerson, 478 F.2d 813, 815 (8th Cir. 1973); United States v. Ogden, 485 F.2d 536, 538–539 (9th Cir. 1973).

43. See cases cited supra notes 41–42.

44. The Supreme Court has yet to pass on the validity of the airline search. It has, however, declined review of a number of circuit rulings, see cases cited supra note 42, and we feel bound to abide its dichotomy between governmental and nongovernmental searches until changed. See text supra at note 39 and cases cited supra notes 39–40.

45. The regulation provides:
   *Inspection of Shipments*—All shipments are subject to inspection by the carrier, but the carrier shall not be obligated to perform such inspection.
   Rule 24 to Airline Tariff Publishers, Inc., Agent, Official Airfreight Rules Tariff, No. 1–B, C.A.B. No. 96.

and examine the box,[46] and that the rule purports to authorize warrantless searches without probable cause, in contravention of the Fourth Amendment. This argument might have force—by itself and without more—if Rule 24 had played the role which appellant ascribes to it,[47] but it is evident to us that it did not.

■■ Rather, the airline's inspection privilege exists independently of Rule 24. It is rooted in the rule of the common law that common carriers have the right to decline shipment of packages proffered in circumstances indicating contents of a suspicious, indeed of a possibly dangerous, nature.[48] Justification for the carrier's refusal is to be found in the exigencies of safeguarding life and property,[49] and undeniably the frustration of criminality is likewise a worthy carrier endeavor.[50] The imperatives of either objective may warrant inquiry by the carrier as to the contents of a parcel tendered for shipment;[51] they may suffice, too, to justify a reasonable inspection of the parcel to fulfill that purpose.[52] And the carrier's interest in ascertaining the character of suspicious parcels intensifies when, as here, the carrier conceivably could find itself faced with a criminal prosecution—albeit one perhaps ill-founded—for unlawfully transporting obscene matter.[53]

46. Supervisor Miller referred to Rule 24 in response to a single question as to the authority under which he opened the box. But see note 61, *infra*, and accompanying text.

47. See Nixon v. Condon, 286 U.S. 73, 84–89, 52 S.Ct. 484, 76 L.Ed. 984 (1932); United States v. Epperson, 454 F.2d 769, 770–771 (4th Cir.), cert. denied, 406 U.S. 947, 92 S. Ct. 2050, 32 L.Ed.2d 334 (1972); United States v. Moreno, 475 F.2d 44, 51 (5th Cir.), cert. denied, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973); United States v. Davis, 482 F.2d 893, 896–904 (9th Cir. 1973).

48. Brass v. Maitland, 6 Ellis & B.L. 470, 119 Eng.Rep. 940, 946 (Q.B.1856); Crouch v. London & N. W. Ry., 14 Com.B. 291, 139 Eng.Rep. 105, 120, 121, 122 (Com.Pleas 1854). See also Nitro-Glycerine Case (Parrott v. Wells), 82 U.S. (15 Wall.) 524, 535–536, 21 L.Ed. 206 (1872); Bruskas v. Railway Express Agency, 172 F.2d 915, 918 (10th Cir. 1949). As the Court in *Bruskas* stated:

> [T]he carrier was under no duty to ascertain the contents of a shipment free from suspicion, or to require information as to the contents of the package offered as a condition of transportation. It was only when the appearance of the package or other circumstances excited the suspicion of the carrier, that it incurred any duty to inquire concerning the contents of the package offered, as a condition for carriage.

172 F.2d at 918. See also Dinsmore v. Louisville, N. A. & C. R.R., 3 F. 593, 605–606 (C.C.D.Ind.1880); The Buenos Aires, 46 F.2d 693, 695 (S.D.N.Y.1931); State v. Swett, 87 Me. 99, 32 A. 806, 809–810 (1895).

49. See, *e. g.*, United States v. Cangiano, *supra* note 42, 464 F.2d at 324.

50. "[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." Coolidge v. New Hampshire, *supra* note 39, 403 U.S. at 488, 91 S.Ct. at 2049. See also Miranda v. Arizona, 384 U.S. 436, 477–478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

51. Nitro-Glycerine Case (Parrott v. Wells), *supra* note 48, 82 U.S. (15 Wall.) at 535–536, 21 L.Ed. 206; Bruskas v. Railway Express Agency, *supra* note 48, 172 F.2d at 918; Adams Express Co. v. Commonwealth, 129 Ky. 420, 112 S.W. 577, 579–580, 18 L. R.A., N.S., 1182 (1908); Commonwealth v. Mixer, 207 Mass. 141, 93 N.E. 249, 252 (1910).

52. Adams Express Co. v. Commonwealth, *supra* note 51, 112 S.W. at 579–580; Commonwealth v. Mixer, *supra* note 51, 93 N.E. at 252.

53. "The general rule [is] to the effect that a carrier cannot insist ordinarily upon obtaining knowledge of the character of goods offered for transportation is subject to a well recognized exception where a statute expressly or impliedly confers that right. The statute with which we are dealing is of that class, and by its imposition of criminal responsibility for transporting the prohibited articles necessarily clothes the carrier with power to obtain such knowledge as may protect him, or to refuse to take the proffered goods." Commonwealth v. Mixer, *supra* note 51, 93 N.E. at 252 (citations omitted).

In the case at bar, United Airlines unquestionably had an important interest in learning the contents of the box, which in the circumstances prevailing only an inspection could safeguard. It all began when the man self-styled "Tom Moore" [54] tendered the box for shipment, and equivocated on revealing its contents for purposes of the air bill which Rex Feight was trying to prepare. Outwardly reluctant to respond, the shipper first disclaimed any knowledge and, told by Feight that dangerous or illegal parcels could not be accepted and after "a couple of minutes" of nervous hesitation,[55] he finally suggested that it was "something personal." It was Feight's understandable suspicion that the box contained contraband that prompted Supervisor Miller's decision to inspect it.[56] When Miller opened the box, he saw 30 reels of unpackaged film bearing labels suggesting that they depicted explicit sexual activity, and eyeviewing two of the reels, it seemed that they did. That discovery urged fuller confirmation of their obscene character by projection, which Miller proceeded to obtain.[57]

So, a theme of reasonableness pervaded all that occurred at the San Francisco airport. The suspicious behavior of "Tom Moore" and his refusal to identify the contents of the box with any degree of specificity warranted an inspection of the box before putting it aboard a plane. Once the box was opened, the unpackaged reels of film bearing sex-suggesting titles justified closer examination, ultimately by use of the projector, to see whether they were in fact contraband.[58] In sum, each event in this succession prompted naturally the next—in the interest of protecting against the distinct probability of hazardous or illicit cargo. Neither the law nor common sense dictated a different course.[59]

54. The evidence at trial disclosed that this party was never located. See note 5, *supra*.

55. See note 5, *supra*.

56. See note 9, *supra*.

57. The events just summarized were established by uncontradicted evidence at trial. As we have stated, appellant's motion to suppress attacked the search warrant affidavit on its face, and no evidence on the San Francisco episode was introduced. See note 22, *supra*.

58. Compare United States v. Cangiano, *supra* note 42, 464 F.2d at 323, 324; Gold v. United States, *supra* note 42, 378 F.2d at 590.

59. We are mindful of appellant's contention that even if United Airlines' inspection of the box was proper, FBI agents in San Francisco should have applied there for a warrant as soon as the character of the films became known. The argument, as we understand it, is that that course of action would have enabled the agents to exhibit the films to a magistrate for a determination on the propriety of seizure, and might thereby have aborted their interstate shipment in violation of law. Like Judge Pratt, we believe a warrantless seizure of the films for a judicial showing to support the issuance of a warrant for their seizure is a procedure fraught with constitutional difficulties. See United States v. Pryba, *supra* note 23, 312 F.Supp. at 370–371. Moreover, the FBI projected its investigation beyond the events transpiring at the San Francisco airport, and only after the box had been returned to transit did the FBI learn that the sender's address was fictitious. "Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966). See also Ringer v. United States, 463 F.2d 1083, 1085 (8th Cir. 1972); United States v. Leon, 460 F.2d 299, 300 (9th Cir. 1972). Nor are law enforcement officers obliged to intercept incipient criminality before the participation of others therein can be ascertained. United States v. Sizer, 292 F.2d 596, 599 (4th Cir. 1961); United States v. Schrenzel, 462 F.2d 765, 775 (8th Cir.), cert. denied, 409 U.S. 984, 93 S.Ct. 325, 34 L.Ed.2d 248 (1972). See Koran v. United States, 469 F.2d 1071, 1072 (5th Cir. 1972). Interstate shipment of obscene material is a continuing offense, involving both the consignor and his willing consignee, Gold v. United States, *supra* note 42, 378 F.2d at 594, and the FBI was at liberty to pursue the consignee of the films by allowing the shipment to be completed. United States v. Mahoney, 355 F.Supp. 418 (E.D.La.1973).

■ Indubitably, air freight carriers share the qualified right of package-inspection with other common carriers of goods.[60] Rule 24 of CAB Regulation 96 merely recognizes that air carriers possess that right.[61] That bare recognition cannot be equated with a grant of governmental authority to search,[62] nor could it transform an inspection initiated and conducted solely by the carrier for its own protection into a search under the aegis of the Federal Government.[63] We hold that the activities of the airline freight supervisor in this case remained beyond the reach of the Fourth Amendment.

It will be recalled, however, that United Airlines brought the FBI into the picture before the box departed the San Francisco airport. When Supervisor Miller discovered the presence and character of the films in the box, he notified the FBI. Shortly thereafter, an FBI agent appeared with a projector, with which Miller viewed two more films, and apparently the agent was still there when Miller repackaged the films for shipment to Washington. The remaining question is whether this sort of cooperation by the FBI converted the airlines' permissible inspection into an impermissible search of the box.

We have held that the inspection which Miller conducted prior to notifying the FBI did not implicate the Fourth Amendment.[64] And we are unable to perceive in the subsequent events any new or different search after the FBI agent arrived. There is respectable authority holding that not even a reopening and reinspection of a package by federal officers, after the initial opening and inspection by airline personnel entirely on their own, constitutes a separate or additional search subject to Fourth Amendment requirements.[65] We need not venture nearly so far, for much less than reopening and reinspection of the box and its contents was the activity of the FBI in the instant case.[66]

■ The record discloses that the FBI responded to Miller's call by sending an agent with whose projector and in whose presence Miller resumed his examination of the films. There is not the slightest hint in the record that the FBI or the agent did anything more. The situation thus falls well within the range of governmental collaboration in airline inspections which many decisions have held the Fourth Amendment tolerates.[67] In our view, the FBI's limited role in the airport inspection of the

**60.** This is implicit in decisions finding in the airline's regulations or specifications express authority to inspect, see United States v. Cangiano, *supra* note 42, 464 F.2d at 324; United States v. Blum, *supra* note 42, 329 F.2d at 52; United States v. Echols, *supra* note 42, 477 F.2d at 40; United States v. Harding, *supra* note 42, 475 F.2d at 482, and, as well, in decisions upholding airlines' inspections without indicating the source of the authority, United States v. Blanton, United States v. Valen, United States v. Burton, Clayton v. United States, Gold v. United States, all *supra* note 42. In some instances, the right of inspection has been conceded. United States v. Tripp, *supra* note 42, 468 F.2d at 570; Wolf Low v. United States, *supra* note 42, 391 F.2d at 62 n. 1.

**61.** Rule 24 acknowledges that air freight shipments are subject to the carrier's inspection, but expressly provides that the carrier is not obligated to inspect. See note 45, *supra*. The decision to inspect remains

the carrier's as do the purpose and benefit of an inspection.

**62.** Compare Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. Seattle, 387 U.S. 541, 87 S. Ct. 1737, 18 L.Ed.2d 943 (1967).

**63.** See United States v. DeBerry, *supra* note 42, 487 F.2d at 450; United States v. Cangiano, *supra* note 42, 464 F.2d at 324.

**64.** See text *supra* at notes 42–62.

**65.** United States v. Blanton, *supra* note 42, 479 F.2d at 328–329; Barnes v. United States, *supra* note 39, 373 F.2d at 518; Clayton v. United States, *supra* note 42, 413 F.2d at 298; Wolf Low v. United States, *supra* note 42, 391 F.2d at 63.

**66.** The record shows plainly that the box remained open at the time the FBI agent arrived with the projector.

**67.** United States v. Cangiano, *supra* note 42, 464 F.2d at 322–335; United States v. Blum,

box in question did not activate the Fourth Amendment.

### B.  *The Washington Search*

Appellant's assault on the search of the premises of the Potomac News Company in Washington dwells exclusively on the affidavit underlying the warrant purportedly authorizing that search. The affidavit [68] was made by Special Agent James W. Garten of the FBI, in part on information and belief. It states unequivocally that the sought-after "films depict a man and a female engaged in sexual intercourse, and various other sexual activities by males and males and males and females," [69] but without an averment that the affiant ever personally saw an exhibition of the films or ever personally talked with anyone who did. Asserting that so much of the affidavit was based upon hearsay allegations of obscenity, appellant argues that the affidavit was insufficient to furnish probable cause for issuance of the search warrant.

A finding of probable cause for the issuance of a search warrant is not foreclosed merely by the circumstance that the information upon which it issues is hearsay as to the affiant rather than facts personally known by him.[70] What is required is "a substantial basis for crediting the hearsay" [71] —a crediting by the magistrate to whom the application for the warrant is made.[72] The affidavit must divulge "some of the underlying circumstances from which the informant concluded" that a crime had been committed "and some of the underlying circumstances from which the [affiant] concluded that the informant . . . was 'credible' or his information 'reliable.' " [73] It must support an "inference that the informer was generally trustworthy and that he made his charge against [the suspect] on the basis of information obtained in a reliable way." [74] When these demands are met and a magistrate finds probable cause for a warrant, his

*supra* note 42, 329 F.2d at 50, 52; United States v. Valen, *supra* note 42, 479 F.2d at 468–470; United States v. Blanton, *supra* note 42, 479 F.2d at 327–328; United States v. Echols, *supra* note 42, 477 F.2d at 38–40; Wolf Low v. United States, *supra* note 42, 391 F.2d at 62, 63; Gold v. United States, *supra* note 42, 378 F.2d at 590–591; United States v. Harding, *supra* note 42, 475 F.2d at 481–482, 483–484; United States v. Ogden, *supra* note 42, 485 F.2d at 536; United States v. Wilkerson, *supra* note 42, 478 F.2d at 814–815.

68.  See appendix hereto.

69.  Appendix ¶ 5.

70.  Spinelli v. United States, 393 U.S. 410, 412, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Rugendorf v. United States, 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Jones v. United States, 362 U.S. 257, 270–271, 272, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). See generally, United States v. Thornton, 147 U.S.App.D.C. 114, 116–119, 454 F.2d 957, 959–962 (1971).

71.  Jones v. United States, *supra* note 70, 362 U.S. at 269, 80 S.Ct. at 735. See also United States v. Ventresca, *supra* note 70, 380 U.S. at 110, 85 S.Ct. 741; Aguilar v. Texas,

*supra* note 70, 378 U.S. at 114, 84 S.Ct. 1509; Rugendorf v. United States, *supra* note 70, 376 U.S. at 533, 84 S.Ct. 825. See also Draper v. United States, 358 U.S. 307, 312, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (arrest without a warrant).

72.  Spinelli v. United States, *supra* note 70, 393 U.S. at 416, 89 S.Ct. 584; Aguilar v. Texas, *supra* note 70, 378 U.S. at 114, 84 S.Ct. 1509; Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). See also United States v. Ventresca, *supra* note 70, 380 U.S. at 109, 85 S.Ct. 741; Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

73.  Aguilar v. Texas, *supra* note 70, 378 U.S. at 114, 84 S.Ct. at 1514. See also Spinelli v. United States, *supra* note 70, 393 U.S. at 416, 89 S.Ct. 584; McCray v. Illinois, 386 U.S. 300, 304, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); United States v. Ventresca, *supra* note 70, 380 U.S. at 108–109, 85 S.Ct. 741; Jones v. United States, *supra* note 70, 362 U.S. at 269, 80 S.Ct. 725; Nathanson v. United States, 290 U.S. 41, 47, 54 S.Ct. 11, 78 L.Ed. 159 (1933).

74.  Spinelli v. United States, *supra* note 70, 393 U.S. at 417, 89 S.Ct. at 589. See also Kleinbart v. United States, 142 U.S.App.D.C. 1, 3, 439 F.2d 511, 513 (1970).

determination is entitled to great deference by the courts.[75]

We do not doubt the applicability of these principles when the warrant sought would authorize a search for and a seizure of allegedly obscene material as evidence.[76] Nor do we doubt that the preconditions which these principles impose were satisfied here. The affidavit acknowledged the affiant's receipt of the information encouched in the affidavit from the San Francisco office of the FBI.[77] It chronicles the events at the San Francisco airport culminating in Supervisor Miller's discovery of the films in the box;[78] it describes the films in terms plainly connoting obscenity;[79] it then traces the box' journey from the airport to the premises occupied by the Potomac News Company.[80] Clearly then, the affidavit supplied circumstances which might underpin a reasonable belief that federal and District of Columbia obscenity laws had been violated. We think, too, as did the District Court, that the magistrate —here a United States Commissioner— could reasonably conclude that Supervisor Miller, by virtue of his responsible position with United Airlines, coupled with the complete absence of any apparent motive to falsify, was a reliable informant who came by his information in a thoroughly reliable way.[81] We hold, upon a reading of the affidavit "in a commonsense and realistic fashion,"[82] that the fact that some of the affidavit's allegations were hearsay is unobjectionable.

Appellant also contends that the affidavit was deficient as a means of conveying to the Commissioner enough information to enable a suitable determination respecting the alleged obscenity of the films. The general principles measuring claims of this character are quite clear. "A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material."[83] Where the material to be seized lies within the ambit of the First Amendment, the procedure must retain a "necessary sensitivity to freedom of expression;"[84] it must "assure nonobscene material the protection to which it is entitled";[85] and so the affidavit must afford the magistrate an opportunity to "focus searchingly on the question of obscenity."[86] In our view, these standards were met in this case.

75. Spinelli v. United States, *supra* note 70, 393 U.S. at 419, 89 S.Ct. 584; United States v. Ventresca, *supra* note 70, 380 U.S. at 109, 85 S.Ct. 741; Jones v. United States, *supra* note 70, 362 U.S. at 270–271, 80 S.Ct. 725. But see Aguilar v. Texas, *supra* note 70, 378 U.S. at 111, 84 S.Ct. 1509.

76. See United States v. Santiago, 424 F.2d 1047 (1st Cir. 1970), and United States v. Melvin, 419 F.2d 136 (4th Cir. 1969). Each of these decisions proceeded on the basis that an affidavit founded on creditable evidence could be accepted, but concluded that the preconditions therefor had not been met. See Part III, *infra.*

77. Appendix ¶ 1.

78. Appendix ¶ ¶ 2–4.

79. Appendix ¶ 5.

80. Appendix ¶ ¶ 6–9.

81. See United States v. Pryba, *supra* note 23, 312 F.Supp. at 371.

82. United States v. Ventresca, *supra* note 70, 380 U.S. at 108, 85 S.Ct. at 746. See also, Spinelli v. United States, *supra* note 70, 393 U.S. at 415, 419, 89 S.Ct. 584.

83. Roaden v. Kentucky, *supra* note 4, 413 U. S. at 501, 93 S.Ct. at 2800.

84. Lee Art Theatre v. Virginia, 392 U.S. 636, 637, 88 S.Ct. 2103, 2104, 20 L.Ed.2d 1313 (1968). See also A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L. Ed.2d 809 (1964); Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

85. Marcus v. Search Warrant, *supra* note 84, 367 U.S. at 731, 81 S.Ct. at 1716.

86. *Id.* at 732, 81 S.Ct. at 1716. The Supreme Court has recently made clear that this is the standard at least where the seizure would suddenly bring to a standstill a presumptively legal distribution or exhibition of the material. Roaden v. Kentucky, *supra* note 4, 413 U.S. at 502–505, 93 S.Ct. 2796. Without additional guidance in this difficult area, we may assume for purposes of this case the same standard governs the search under scrutiny.

■ The question before the Commissioner was whether, on the allegations of the affidavit, there was probable cause for believing that a violation of obscenity laws had occurred. And "[i]n dealing with probable cause, . . . we deal with probabilities" ;[87] "the term 'probable cause' . . . means less than evidence which would justify condemnation."[88] The affidavit stated that the "films depict" not only "a man and a female engaged in sexual intercourse" but also "various other sexual activities by males and males" as well as by "males and females."[89] We have no difficulty whatever in accepting that information as an adequate foundation for a belief by the Commissioner, if persuaded to so believe, that the films might well be adjudged obscene.[90]

The allegations made by the affidavit satisfied the Commissioner that there was probable cause to believe that the films were being concealed at the Potomac News Company.[91] The District Court upheld that finding,[92] and we feel obliged to do the same. According the Commissioner's determination of probable cause the "great deference" it is due,[93] and perceiving a "substantial basis for him to conclude" as he did,[94] we hold that the search of the Potomac News Company was completely authorized.

### III

We now turn our attention to appellant's argument that use of the films as evidence at his trial was impermissible because no adversary hearing leading to an affirmative determination of obscenity was held before they were seized at the Potomac News Company. Heller v. New York,[95] in which the Supreme Court considered the need for adversary hearings preceding seizures of allegedly obscene materials, furnishes welcome guidance in the resolution of that contention.[96] Recognizing fully that in some situations a pre-seizure adversary hearing is required, we reject the claim that such a proceeding became necessary in this case.[97]

87. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). See also Draper v. United States, *supra* note 71, 358 U.S. at 313, 79 S.Ct. 329.

88. United States v. Ventresca, *supra* note 70, 380 U.S. at 107, 85 S.Ct. at 745, quoting Locke v. United States, 11 U.S. (7 Cranch) 339, 348, 3 L.Ed. 364 (1813). See also Jones v. United States, *supra* note 70, 362 U.S. at 270, 80 S.Ct. 725; Draper v. United States, *supra* note 71, 358 U.S. at 311–312, 79 S.Ct. 329; Brinegar v. United States, *supra* note 87, 338 U.S. at 173, 69 S.Ct. 1302.

89. Appendix ¶ 5. Unlike the affidavits in Marcus v. Search Warrant, *supra* note 84, and Lee Art Theatre v. Virginia, *supra* note 84, which set forth nothing more than bare conclusionary allegations that the materials to be seized were obscene—the affidavit here describes, though in good taste briefly, what the films depict.

90. Miller v. California, *supra* note 25, 413 U.S. at 24–26, 93 S.Ct. 2607.

91. The search warrant specifically states that the Commissioner was "satisfied that there is probable cause to believe that the property [described therein] is being concealed on the premises" of the Potomac News Company.

92. United States v. Pryba, *supra* note 23, 312 F.Supp. at 371–372.

93. Spinelli v. United States, *supra* note 70, 393 U.S. at 419, 89 S.Ct. 584. See also Jones v. United States, *supra* note 70, 362 U.S. at 270–271, 80 S.Ct. 725. But see Aguilar v. Texas, *supra* note 70, 378 U.S. at 111, 84 S.Ct. 1509.

94. Jones v. United States, *supra* note 70, 362 U.S. at 271, 80 S.Ct. at 736. See also Aguilar v. Texas, *supra* note 70, 378 U.S. at 111, 84 S.Ct. 1509; Johnson v. United States, *supra* note 72, 333 U.S. at 13–14, 68 S.Ct. 367.

95. 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973).

96. See note 4, *supra.*

97. We need not consider whether suppression of the use of the films as evidence at trial is an appropriate remedy for the omission of a required adversary hearing. In a pre-*Heller* decision, following the lead of other cases, we expressed the view that the rule excluding illegally seized evidence does not apply where a seizure is defective because no prior adversary hearing was conducted. Huffman v. United States, *supra* note 4, 152 U.S. App.D.C. at 244, 470 F.2d at 392. That, we

At the core of the question is the interest in minimizing any interference with access to matter potentially protected by the First Amendment unless and until its obscenity has been judicially established.[98] A seizure of such matter may operate as a prior restraint, and "[a]ny system of prior restraints of expression comes [into court] bearing a heavy presumption against its constitutional validity."[99] And "because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint."[100] So, where a large quantity of expressive matter is seized solely for the purpose of destruction, a prior judicial determination of obscenity in an adversary proceeding is essential.[101] So also, where the matter is seized with a view to absolute suppression—a final restraint—a judicial determination must be made "promptly so that administrative delay does not in itself become a form of censorship."[102]

It is now clear, too, that where allegedly obscene matter is seized pursuant to a search warrant for evidentiary use in a criminal prosecution, there is no absolute right to a prior adversary hearing.[103] In *Heller,* the Court pointed out that "seizing films to destroy them or to block their distribution or exhibition is a very different matter from seizing a single copy of a film for the *bona fide* purpose of preserving it as evidence in a criminal proceeding. . . ."[104] Such a temporary restraint does not itself "become a form of censorship,"[105] and the Fourth Amendment warrant procedure serves in large part to protect the First Amendment concerns which underlie the adversary

said, is because "the primary right involved is the public's First Amendment right of access rather than the defendant's Fourth Amendment immunity from unreasonable search and seizure," *id.*; relief from the denial of a legitimate claim to a pre-seizure hearing, we added, should be afforded by a return of the seized items on condition that copies are made available as evidence in future criminal prosecutions. *Id.* at 244–245, 470 F.2d 386. Since we conclude that appellant was not entitled to a pre-seizure adversary hearing, we do not reach any question as to whether *Heller* affects our holding in *Huffman.*

98. Heller v. New York, *supra* note 4, 413 U. S. at 491, 493, 93 S.Ct. 2789; A Quantity of Books v. Kansas, *supra* note 84, 378 U.S. at 210–213, 84 S.Ct. 1723; Marcus v. Search Warrant, *supra* note 84, 367 U.S. at 729–731, 81 S.Ct. 1708.

99. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). See also Heller v. New York, *supra* note 4, 413 U.S. at 491, 93 S.Ct. 2789; New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

100. Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). See also Heller v. New York, *supra* note 4, 413 U.S. at 489, 93 S.Ct. 2789; United States v. Thirty-Seven Photographs, 402 U. S. 363, 367, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

101. Heller v. New York, *supra* note 4, 413 U.S. at 491, 93 S.Ct. 2789; A Quantity of Books v. Kansas, *supra* note 84, 378 U.S. at 209–213, 84 S.Ct. 1723; Marcus v. Search Warrant, *supra* note 84, 367 U.S. at 729–733, 81 S.Ct. 1708.

102. United States v. Thirty-Seven Photographs, *supra* note 100, 402 U.S. at 367, 91 S.Ct. at 1404. See also Heller v. New York, *supra* note 4, 413 U.S. at 489, 93 S.Ct. 2789; Freedman v. Maryland, *supra* note 100, 380 U.S. at 57–59, 85 S.Ct. 734. The hearing spoken of here is a post-seizure rather than a pre-seizure hearing. See Heller v. New York, *supra* note 4, 413 U.S. at 489, 93 S. Ct. 2789.

103. Heller v. New York, *supra* note 4, 413 U.S. at 488, 93 S.Ct. 2789. This is so although the matter seized is the only copy of the material available. See *id.* at 492–493, 93 S.Ct. 2789.

104. *Id.* at 492, 93 S.Ct. at 2794.

105. *Id.* at 490, 93 S.Ct. 2789, quoting United States v. Thirty-Seven Photographs, *supra* note 100, 402 U.S. at 367, 91 S.Ct. 1400.

hearing sometimes required.[106]  Said the Court:

> If such a seizure is pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party the seizure is constitutionally permissible.  In addition, on a showing to the trial court that other copies of the film are not available to the exhibitor, the court should permit the seized film to be copied so that showing can be continued pending a judicial determination of the obscenity issue in an adversary proceeding.  Otherwise, the film must be returned.[107]

■ In the case at bar, a United States Commissioner found probable cause to believe that the suspect films were obscene, and issued a search warrant prior to their seizure.[108]  Promptly after execution of the warrant, the Government arranged a hearing before a district judge, at which appellant was afforded the opportunity to oppose the Government's obscenity claim.[109]  That appellant made no effort to resist the claim, but instead disdained the proceeding,[110] in no way impaired its constitutional sufficiency.[111]  We hold that the films were not barred from evidentiary use at appellant's trial merely because the proceeding did not occur sooner.[112]

## IV

■ We now reach appellant's contention that the statute upon which the charge of interstate transportation of obscene matter is based is unconstitutional as applied to a shipment of such matter to an adult solely for private, noncommercial exhibition.  The statute, 18 U.S.C. § 1462, in relevant part proscribes the knowing use of a common carrier for carriage of any obscene motion-picture films in interstate commerce, and the knowing receipt from a common carrier of any obscene films so transported.[113]  The uncontradicted evidence at appellant's trial disclosed that he ordered two copies of each of 15 clearly obscene films, intending to keep one set of copies for his own personal use and to give the other set to his attorney.[114]  The germinal force in appellant's argument is the Supreme Court's holding in Stanley v. Georgia [115] that the First Amendment protects from governmental interference the mere possession of obscene material in the privacy of one's own home.  From that premise appellant reasons that the right to possess such material includes the right to obtain and receive it from a third party, and that transportation of the

---

106. "The necessity for a prior judicial determination of probable cause will protect against gross abuses, while the availability of a prompt judicial determination in an adversary proceeding following the seizure assures that difficult marginal cases will be fully considered in light of First Amendment guarantees, with only a minimal interference with public circulation pending litigation." Heller v. New York, *supra* note 4, 413 U.S. at 493, 93 S.Ct. at 2795.

107. *Id.* at 492–493, 93 S.Ct. at 2795 (footnotes omitted).

108. See Part II(B), *supra.*

109. See text *supra* at notes 16–17.

110. See text *supra* at notes 16–17.

111. Heller v. New York, *supra* note 4, 413 U.S. at 490–491, 93 S.Ct. 2789.

112. Appellant's claimed entitlement to a pre-seizure adversary hearing is further undercut by his consistent claim that he acquired the films solely for his own private use and for non-commercial exhibition.  See Parts IV–V, *infra.*  Surely, then, no public interest was affected by the absence of a pre-seizure hearing.  See United States v. Pryba, *supra* note 23, 312 F.Supp. at 369.  And appellant's own interest was constitutionally minimized by the promptly arranged post-seizure hearing, and by access to copies of the films which was his for the asking.  See text *supra* at note 107.

113. See note 1, *supra.*

114. See note 24, *supra.*

115. 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

materials to enable personal possession and private use enjoys the same constitutional protection. Judge Pratt disagreed, and we are satisfied that appellant's thesis cannot be validated by reliance on *Stanley*, but indeed is foreclosed by the Supreme Court's more recent decision in United States v. Orito,[116] which upholds the constitutionality of Section 1462 in a similar application.

Like appellant, Orito was indicted for a violation of Section 1462 stemming from the shipment of obscene films via air common carrier from San Francisco to Milwaukee. A district court had granted Orito's motion to dismiss the indictment on the ground that Section 1462 was unconstitutionally overbroad because it reached "nonpublic" as well as "public" transportation of obscene matter,[117] but the Supreme Court reversed. Uncertain as to whether the district court deemed the shipment constitutionally protected because the transportation was solely for private use, or rather because, irrespective of intended use, "private" or "nonpublic" transportation in itself involves no risk of exposure to children or unwilling adults, the Supreme Court found that neither rationale would support the district court's action.[118] Since *Orito* bears importantly on the constitutional position appellant advances elsewhere as well as here,[119] we may profitably pursue a somewhat deeper analysis of the Court's decision.

The Court began by pointing out that it has not accepted the view that the right to possess obscene matter in the privacy of one's own home encompasses correlatively a right to receive, transport or distribute it.[120] The principle underlying *Stanley*, the Court said, is that the Constitution extends special safeguards to the privacy of the home, in common with a few other special societal institutions.[121] On the other hand, shipment of obscene material by common carrier in interstate commerce does not enjoy the same solicitude accorded possession of such material in the home [122] and, the Court added, it has consistently declined to accord constitutional protection to obscene materials outside the home.[123] Summarizing the relevant considerations, the Court stated:

> Given (a) that obscene material is not protected under the First Amendment, . . . (b) that the government has a legitimate interest in protecting the public commercial environment by preventing such materials from entering the stream of commerce, . . . and (c) that no constitutionally protected privacy is involved, . . . we cannot say that the Constitution forbids comprehensive federal regulation of interstate transportation of obscene material merely because such transport may be by private carriage, or because material is intended for the private use of the transporter.[124]

That conclusion follows, the Court held, because even if the carriage is "nonpublic," Congress could "regulate on the basis of the natural tendency of material in the home being kept private and the contrary tendency once material leaves that area, regardless of a transporter's professed intent." [125] And "Congress could reasonably determine such regulation to be necessary to effect permissible federal control of interstate commerce in obscene materials, based as that regulation is on a legislatively determined·risk of exposure to juveniles or to the public

---

116. *Supra* note 4.

117. United States v. Orito, 338 F.Supp. 308, 311 (E.D.Wis.1970), vacated, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973).

118. 413 U.S. at 140–141, 93 S.Ct. 2674.

119. See Part V, *infra*.

120. 413 U.S. at 141–142, 93 S.Ct. 2674.

121. *Id.* at 142, 93 S.Ct. 2674.

122. *Id.*

123. *Id.* at 143, 93 S.Ct. 2674. See the cases there cited.

124. *Id.* (citations omitted).

125. *Id.*

and the harm that exposure would cause." [126]

Thus, in *Orito*, the Supreme Court has unequivocally refused to invalidate Section 1462 on the basis urged here by appellant. With *Orito* controlling, we reject his claim that criminal penalties may not be imposed on an adult who knowingly receives, though for personal use, obscene films from an interstate shipment by a common carrier.

## V

As in his challenge to his conviction for violating Section 1462, appellant relies on Stanley v. Georgia [127] to argue that the prohibition in D.C.Code § 22–2001 against possession of obscene material with the intent to distribute [128] could not constitutionally be extended to the films in question. Judge Pratt concluded that the undisputed evidence that appellant intended to give a copy of each of the 15 different films to his attorney [129] brought appellant into fatal collision with the statute. Contending that that transaction—a noncommercial private transfer between consenting adults—would derive First Amendment protection from *Stanley*, appellant urges us to reverse his conviction under Section 22–2001 on that ground.

The Supreme Court has not had occasion to evaluate the constitutionality of any possession statute similar to the one now under scrutiny.[130] We think, however, the Court's rejection of the *Stanley* argument when made in opposition to statutory prohibitions on importation,[131] mailing,[132] and interstate transportation of obscene material [133] has set the boundaries beyond which *Stanley* will not be extended. In United States v. Orito,[134] discussed in the preceding section, the Court explicitly held that the right to privately possess obscene material in the home does not embrace a "correlative right to receive it, transport it or *distribute it.*" [135] On the same day the Court, in United States v. Twelve 200-Ft. Reels,[136] held that a federal statute forbidding the importation of obscene material into the United States [137] was constitutionally applicable to an individual who brought such matter in for private personal use only.[138] "[T]he protected right to possess obscene material in the privacy of one's home," said the Court, "does not give rise to a correlative right to have someone sell or *give* it to others." [139] And two years earlier in United States v. Reidel,[140] the Court held that a statute prohibiting the knowing use of the mails for the delivery of obscene

126. *Id.* at 143–144, 93 S.Ct. at 2678.

127. *Supra* note 115.

128. See note 2, *supra*.

129. While the evidence establishes unequivocally that appellant intended to do that, it does not disclose why appellant had that purpose in mind. We cannot understand why appellant would need to order an extra set of the copies if the reason was vitally associated with the rendition of professional service. We intimate no view on a case in which that is really the reason; on the record before us, any thought in that direction would be sheer speculation.

130. In Newman v. Conover, 313 F.Supp. 623, 626 (N.D.Tex.1970), a three-judge court upheld the constitutionality of a Texas statute making it a misdemeanor, *inter alia*, to "possess with intent to distribute" any obscene material. See also Gable v. Jenkins, 309 F.

Supp. 998 (N.D.Ga.1969), aff'd, 397 U.S. 592, 90 S.Ct. 1351, 25 L.Ed.2d 595 (1970).

131. United States v. Twelve 200-Ft. Reels, *supra* note 4.

132. United States v. Reidel, 402 U.S. 351, 354–356, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971).

133. United States v. Orito, *supra* note 4, discussed *supra* Part IV.

134. *Supra* note 4.

135. 413 U.S. at 141, 93 S.Ct. at 2677 (emphasis supplied).

136. *Supra* note 4.

137. 19 U.S.C. § 1305(a) (1970).

138. 413 U.S. at 125–129, 93 S.Ct. 2665.

139. *Id.* at 128, 93 S.Ct. at 2669 (emphasis supplied).

140. *Supra* note 132.

matter [141] was validly applicable to the distribution of such matter to willing adult recipients.[142]

Appellant's approach to the problem at hand attributes to *Stanley* a sweep far beyond its precise holding. The pervasive theme of *Stanley* is constitutional protection of a mere private possession and use of obscene material which the possessor undertakes to maintain within the confines of his home. As explained at one point by the Court,

> These are the rights that appellant is asserting in the case before us. He is asserting the right to read or observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his own home. He is asserting the right to be free from state inquiry into the contents of his library . . . . Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.[143]

As, two years after *Stanley*, the Court was to point out, "[t]he focus of this language was on freedom of mind and thought and on the privacy of one's

home. . . . The personal constitutional rights of those like Stanley to possess and read obscenity in their homes and their freedom of mind and thought do not depend on whether the materials are obscene or whether obscenity is constitutionally protected. Their rights to have and view that material in private are independently saved by the Constitution." [144] And as, still later, the Court was to observe, "[i]t is hardly necessary to catalog the myriad activities that may lawfully be conducted within the privacy and confines of the home, but may be prohibited in public." [145] Personal use of communicative material strictly within the privacy of the home is one thing; possession of the material with intent to disseminate to another is something else. It is clear that possession of obscene matter with a view to commercial dissemination may be outlawed.[146] We think a fair reading of the cases since the *Stanley* decision makes it equally clear that that decision does not immunize the possession simply because the intent to disseminate is not commercially oriented or motivated.[147]

█ These considerations appear to settle the matter insofar as appellant's attack on Section 22–2001 is concerned. The conduct which the statute forbids is not the mere possession of obscene material, but possession with an intent to disseminate it.[148] We perceive nothing unreasonable or uncommon in a congressional endeavor to deter the distribution

141. 18 U.S.C. § 1461 (1970).

142. 402 U.S. at 353–356, 91 S.Ct. 1410.

143. 394 U.S. at 565, 89 S.Ct. at 1248.

144. United States v. Reidel, *supra* note 132, 402 U.S. at 356, 91 S.Ct. at 1412.

145. United States v. Orito, *supra* note 4, 413 U.S. at 142–143, 93 S.Ct. at 2677.

146. See, *e. g.*, United States v. Thirty-Seven photographs, *supra* note 100.

147. In addition to the obvious difference between private use of obscene matter at home

and its dissemination abroad, there is the recognized difficulty of controlling the uses to which the material may be put. See United States v. Orito, *supra* note 4, 413 U.S. at 143–144, 93 S.Ct. 2674; United States v. Twelve 200-Ft. Reels, *supra* note 4, 413 U.S. at 129, 93 S.Ct. 2665. It is evident that the risk of exposure of the material to juveniles and nonconsenting adults increases with a purpose to disseminate it beyond the limited confines of the home. See United States v. Orito, *supra* note 4, 413 U.S. at 143–144, 93 S.Ct. 2674.

148. See note 2, *supra*.

of obscene items by punishing possession with an intent to distribute.[149] And if, as the Supreme Court has unequivocally declared, the dissemination of obscene matter—whether public or private, or commercial or noncommercial—is not entitled to constitutional protection,[150] there is no reason to expect a different fate for possession with intent to disseminate. We conclude that appellant enjoyed no immunity from prosecution for a violation of Section 22–2001 by virtue of the fact that the only dissemination planned was a gift of copies of the films to another.

The judgment of conviction is accordingly

Affirmed.

## APPENDIX

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

The undersigned affiant, being duly sworn on oath, states that the following facts are true to the best of his knowledge and belief:

(1) The affiant is a Special Agent of the Federal Bureau of Investigation (FBI). That in said capacity he received information from the San Francisco Office of the FBI on May 21, 1969 regarding the shipment of 30 rolls of obscene film from San Francisco, California via United Airlines for delivery to Denis Pryba, Potomac News, 506 8th Street, S.E., Washington, D.C. (WDC).

(2) Robert Miller, Supervisor, United Airlines (UAL), San Francisco International Airport, San Francisco, California, advised Special Agents of the FBI that on May 20, 1969 an individual identifying himself as Tom Moore, 5783 Oak Street, San Francisco, California, delivered a package to UAL for delivery to Denis Pryba, Potomac News, 506 8th Street, S.E., WDC.

(3) The above package is wrapped in brown paper and measures 4 inches by 10 inches by 13 inches and is traveling under Air Number 016–SF 5087250. It weighs 7 pounds and terms of delivery are collect. This description was furnished by Robert Miller, Supervisor of UAL.

The individual delivering this package to UAL was extremely nervous and upon questioning as to the contents attempted to avoid answering and finally stated it contained personal items. The return address is fictitious.

(4) Based upon the peculiar circumstances surrounding receipt of the shipment, Robert Miller, UAL, caused the shipment to be opened and personally observed 30 rolls of hard core pornography. The opening of the package by UAL is permitted by CAB Tariff regulations.

(5) The above films depict a man and a female engaged in sexual intercourse, and various other sexual activities by males and males and males and females.

(6) The above package traveled via United Airlines flight 50 on May 21, 1969 and arrived at Dulles Airport during p. m. of May 21, 1969. It was turned over by UAL at Dulles Airport to Pollard Delivery Service on May 22, 1969 for delivery to Denis Pryba, at Potomac News Company, 506 8th Street, S.E.

---

149. See, *e. g.*, Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 84 Stat. 1242, tit. II, § 401(a), 21 U.S.C. § 841(a) (1970), which prohibits the possession with intent to distribute unlawfully any controlled substance or counterfeit substance listed in the statute.

150. See United States v. Orito, *supra* note 4, 143 U.S. at 141–143, 93 S.Ct. 2674; United States v. Twelve 200-Ft. Reels, *supra* note 4, 413 U.S. at 126, 128–129, 93 S.Ct. 2665; Paris Adult Theatre I. v. Slayton, 413 U.S. 49, 65–67, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); United States v. Reidel, *supra* note 132, 402 U.S. at 353–356, 91 S.Ct. 1410; United States v. Thirty-Seven Photographs, *supra* note 100, 402 U.S. at 375–376, 91 S. Ct. 1400; Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

(7) Fred Murphy, a driver for Pollard Delivery Service, Washington National Airport, was given the above package to deliver on May 22, 1969.

(8) Special Agents of the FBI, observed the above package being delivered by Fred Murphy to the Potomac News Company, 507 8th Street, S.E., WDC, at 3:30 p. m. Investigation determined that the Potomac News Company is located at 507 8th Street, S.E., WDC, rather than at 506 8th Street, S.E.

(9) Fred Murphy, who made the delivery was interviewed by FBI Agents after he was observed leaving the premises of 506 8th Street, S.E. on May 22, 1969 and he admitted that he had delivered the package described above to the above place of business.

(10) The premises of 507 8th Street, S.E., WDC, is a two-story creme color brick building having one door on street level at the front of the building on 8th Street, S.E. and one door and a loading platform at the rear of the building. The building is approximately 100 feet by 50 feet. It is an attached building with the building on the north side of it being numbered 505 and the building on the south of it being numbered 515.

Wherefore, the affiant states that he has probable cause to believe, and does believe, that the above described package is presently on the premises of 507 8th Street, S.E. in violation of Title 18 U.S. Code, Section 1462. The affiant therefore requests the issuance of a search warrant for the entire premises which is numbered 507 8th Street, S.E. and which occupies the numbers between 505 and 515 8th Street, S.E. in attempt to locate the above described package and also to search for any company records, documents relative to this shipment and the receipt of it at that company.

/s/ James W. Garten
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 22nd day of May 1969.

/s/ Sam Wertleb
United States Commissioner