559 F.2d 1286
 UNIVERSAL AMUSEMENT COMPANY, INC., et al., Plaintiffs-Appellees,
v.
Carol VANCE et al., Defendants,
State of Texas, Defendant-Appellant.
Richard C. DEXTER, Plaintiff-Appellee,
v.
Ted BUTLER, District Attorney of Bexar County, Texas, et
al., Defendants- Appellants.
SOUTHLAND THEATRES, INC., et al., Plaintiffs-Appellees,
v.
Ted BUTLER, District Attorney of Bexar County, Texas, et
al., Defendants- Appellants.
 No. 75-4312.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 28, 1977.
 
 Max P. Flusche, Jr., Asst. Atty. Gen., John L. Hill, Atty. Gen., David M. Kendall, First Asst. Atty. Gen., Joe B. Dibrell, Lonny F. Zwiener, Asst. Attys. Gen., Austin, Tex., for State of Tex.
 Douglas C. Young, Keith W. Burris, Asst. Crim. Dist. Attys., San Antonio, Tex., for Butler.
 Edgar Pfeil, Jane Haun Macon, Asst. City Attys., San Antonio, Tex., for Peters.
 Frierson M. Graves, Jr., Memphis, Tenn., Gerald Goldstein, San Antonio, Tex., for R. C. Dexter and Southland.
 Appeals from the United States District Court for the Southern District of Texas.
 Before THORNBERRY and GEE, Circuit Judges, and MARKEY,* Chief Judge.
 GEE, Circuit Judge:
 
 
 1
 Presented with a number of requests for appointment of three-judge district courts to hear challenges to Texas statutes dealing with obscenity, the Chief Judge of this circuit consolidated all such cases for trial before one three-judge district court in Houston. The managing judge of that court attempted to simplify its Brobdingnagian task by choosing and setting for trial those three of the twenty consolidated cases which seemed to represent adequately the challenges of the remaining cases while presenting the fewest possible jurisdictional problems. We consider today the appeals from the district court's orders in two of these cases, 404 F.Supp. 33.[1]
 
 I. KING ARTS THEATRE, INC. v. McCREA
 
 2
 The King Arts Theatre is an indoor, adults-only theater showing sexually explicit motion pictures in San Angelo, Texas. This lawsuit germinated from an apparently informal communication by the county attorney to the theater's landlord informing him that he would bring suit to enjoin future showings of pornographic films. The attorneys for the landlord then wrote to the owners of King Arts telling them of the impending suit and giving notice of termination of the theater's lease.[2] Shortly thereafter King Arts filed this suit seeking injunctive and declaratory relief from any action by the county attorney under the Texas statutes. The case was transferred to the three-judge court in Houston, and all parties agreed to stay their hands until the case could be decided.
 
 
 3
 That court concluded that Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), did not preclude granting the requested relief since no prosecution, civil or criminal, was pending. It also found, however, that prosecution under the Texas nuisance statutes would not cause irreparable injury and, so finding, declined to grant injunctive relief. It determined that Texas courts would construe the phrase "obscene material" in the applicable Texas nuisance statute[3] as the phrase was defined in Tex.Penal Code Ann. § 43.21 (Supp.1976), and upheld that definition against a claim of unconstitutional vagueness. Finally, it found that article 4667(a)(3), considered with articles 4665 and 4666 (which the court considered to be "companion statutes"), was unconstitutional on its face because it operated as an invalid prior restraint on the distribution of materials not yet judicially determined to be obscene. King Arts has not appealed from the denial of injunctive relief or the upholding of the Texas definition of obscenity.
 
 
 4
 Our reading of the Texas nuisance statutes, articles 4664-67, dictates for us a narrower inquiry than that undertaken by the district court. Article 4666[4] provides for suits in the name of the State of Texas to enjoin a nuisance, and if an establishment is adjudged a nuisance under article 4666 there follows the rather draconian mandatory remedy of closing "said house . . . for one year from the date of said judgment," unless the owner provides a one- to five-thousand-dollar penal bond against future violations of the nuisance laws. The district court found that utilizing article 4666 to close a theater for showing obscene films "prevents the dissemination of that which is presumed to be legal and protected by the first amendment," that is, nonobscene films, as a concomitant of "preventing the dissemination of the unwholesome." 404 F.Supp. at 45. We agree that closing a theater under article 4666 for all uses for one year even ameliorated by the provision for reopening under bond would pose serious first amendment questions.[5] Such questions are not posed here, because we find article 4666's one-year closing remedy wholly inapplicable in actions such as this, since we read article 4667(a)(3)'s injunctive remedy as the exclusive procedure for abating obscene exhibitions as nuisances.
 
 
 5
 We note first that apparently no reported Texas cases have applied or discussed the application of the one-year abatement to premises used for manufacturing, distributing or exhibiting obscene material.[6] We thus write on a clean slate and must determine how Texas courts would interpret these nuisance statutes. Both article 4667 and articles 4664-66 have been on the Texas statute books since early in this century, but it was not until the 1973 amendment of article 4667 that obscenity was brought within the purview of either statute. Article 4664[7] defines three types of establishments as "common nuisances," the proprietor of which is guilty of "maintaining a nuisance": gambling houses, houses of prostitution, and places where intoxicating liquors are kept (the latter now being construed primarily as referring to places where liquor law violations take place. State v. Parker, 147 Tex. 57, 212 S.W.2d 132, 133 (1948)). The language of article 4666 appears to refer back to article 4664 to explain what constitutes a nuisance: "Such a nuisance," "such nuisance," "said nuisance," "the acts prohibited in this law." Reinforcing this construction is the fact that articles 4664-66 were enacted by one bill and as one law. Tex.Laws, 2d Called Sess. 1923, ch. 24 at 57-58, and in this original pre-compilation form the references from section 4 (now article 4666) to section 1's (now article 4664's) definition of "nuisance" were even more stark, including references to the "county where the above nuisance is alleged to exist," for example, and to a penal bond "conditioned that the acts prohibited in section 1 of this Act shall not be done . . . ." With the 1923 recompilation of the Revised Civil Statutes, article 4667 came into being, combining several previous statutes providing for injunctive relief against gaming establishments, bawdy houses and "bucket shops," but it was placed (obviously) after the rearward-looking article 4666 with its one-year abatement remedy. Article 4667 did not denominate its various injunction-worthy activities as nuisances, so that an activity within the purview of article 4667 clearly was not subject to article 4666's one-year closing unless it also was an activity (i. e., gambling or prostitution) made a "common nuisance" by article 4664.
 
 
 6
 The same 1973 amendment which brought the commercial manufacture, distribution or exhibition of obscene matter within the coverage of article 4667 also complicated the picture by inserting, for the first time, the word " nuisance" in article 4667:
 
 
 7
 (a) The habitual use . . . of any premises, place or building or part thereof, for any of the following uses shall constitute a public nuisance . . . .
 
 
 8
 (emphasis added). But merely attaching the name "nuisance" to article 4667(a)'s list of enjoinable activities was not intended, we believe, to key in the remedies of article 4666. Had the legislature intended to apply the one-year closing sanction to pornographers' establishments, it could have more clearly signalled such an intent by adding to article 4664[8] appropriate language listing such obscenity-purveying establishments among the few "common nuisances" clearly subject to abatement under article 4666. Perhaps the legislature foresaw the constitutional implications of shutting a communication-oriented business to all forms of expression, and to avoid potential trenching upon the first amendment, chose to authorize only the lesser constraint of an injunction against future exhibitions of unprotected obscene matter[9] by making article 4667, rather than article 4666, applicable to obscenity distribution. Whatever the legislature's motive, we think that even after the 1973 amendments article 4666 still refers solely to the nuisances defined in article 4664 and therefore that the district court in passing on the Texas nuisance statutes unnecessarily considered the effect of a one-year shutdown not authorized by Texas law.[10]
 
 
 9
 This feature aside, we think article 4667(a)(3)'s injunctive procedure basically sound in its application to establishments such as King Arts. The statute authorizes an injunction against the commercial manufacture, distribution or exhibition of obscene material only. Because the injunction follows, rather than precedes, a judicial determination that obscene material has been shown or distributed or manufactured on the premises and because its prohibitions can apply only to further dealings with obscene and unprotected material, it does not constitute a prior restraint. Were a Texas court to issue an overbroad injunction restricting nonobscene (and therefore protected) matter, it would exceed both its constitutional and its statutory authority. While we might not be willing to assume with appellants that every state trial court granting an injunction on the authority of article 4667(a)(3) will draw up a lengthy order specifically enumerating the explicit details of the conduct prohibited, neither will we predict overly broad injunctions affecting protected expression. As we have noted, the district court correctly looked to section 43.21 of the Texas Penal Code for the definition of "obscene" referable to article 4667(a)(3) and found that section 43.21's definition, as construed by Texas courts, met or exceeded constitutional requirements as set down in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). An injunction which infringed first amendment rights would therefore necessarily exceed the court's authority under article 4667(a)(3); state appellate courts presumably stand ready to overturn orders which contravene either state statutes or the federal constitution. And a proprietor enjoined by an order proper under article 4667(a)(3) is prohibited from doing only that which he could not lawfully do anyway, since Texas law prohibits him from commercially exhibiting, possessing for sale, or distributing obscene material. Tex.Penal Code Ann. § 43.23(a)(1) (1974). A lawful injunction subjects him to no further guesswork, in determining what is and is not prohibited, than he must already engage in merely to comply with Texas law.[11] In short, as we read the Texas statutes, they authorize restraint of such expression only as is not constitutionally protected and is prohibited by state law. This is not the stuff of which first amendment violations are made.
 
 
 10
 Finally, we note that in concluding its opinion the court below expressed doubts about the validity of certain Texas procedural rules when applied in the context of obscenity.[12] Their defect is said to be a failure to provide for a prompt "final" judicial determination of whether matter is obscene or not after the issuance of temporary injunction, since a temporary injunction is by definition not a final order. This is said to be required by the Supreme Court's observation in Freedman v. Maryland, 380 U.S. 51, 58-59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), reiterated in Southeastern Productions v. Conrad, 420 U.S. 546, 560, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975), that where obscenity questions are to be dealt with:
 
 
 11
 First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. Third, a prompt final judicial determination must be assured.
 
 
 12
 (original emphasis). But we do not think this passage bears the sense which the court below sought to place upon it, for the context of Freedman and of Conrad, in which these words were spoken, is quite different from the present one.
 
 
 13
 Under the Maryland scheme considered in Freedman, questioned material is drawn before the court only after and because of an earlier determination by an administrative board that it is obscene. The same was true in Conrad, a board having refused use of a municipal theater on grounds that a musical show was obscene. And the Supreme Court's concern, in the passages fixed on by the court below in this case, was that such matter should not be left to rest indefinitely in a state of provisional, administrative condemnation, that there should be a final judicial determination of its quality as obscene or not as contrasted with the obtaining tentative administrative determination within a short and definite period of time after its administrative interdiction. Thus the term "final" as used in Freedman and again in Conrad bears the sense of supervening and does not refer, as the lower court appears to have believed, and to whether the judicial action taken is itself subject to further judicial consideration and possible reversal.[13]
 
 
 14
 So understood, then, this passage from Freedman does not condemn or even concern such procedures as those of Texas (and our) courts by which temporary injunctions are granted or refused pending final hearings on the merits. There need be no supervening judicial hearing following the initial determination within some special, fixed period of time because the initial determination (at hearing on temporary injunction) was itself a judicial one, and there is no administrative decision to supervene. In sum, we find article 4667(a)(3) and the Texas procedures constitutional and therefore REVERSE the judgment of the district court to the contrary.
 
 II. DEXTER v. BUTLER
 
 15
 On June 24, 1974, a San Antonio police officer entered the Fiesta Theater, where the film "Deep Throat" was showing. After viewing the theater's fare, the officer requested an "adversary hearing" to determine the film's probable obscenity, and, within an hour, a hearing took place at the theater itself. Among those attending the proceeding was the theater's operator, Richard Dexter, who had been advised to attend with counsel. At the conclusion of the hearing, the presiding magistrate issued a search warrant authorizing seizure not only of the film but also of the theater's projector, which the warrant characterized as a "criminal instrument" under section 16.01 of the Texas Penal Code. The complaining officer then arrested Dexter, filing charges against him for the misdemeanor offense of commercial obscenity[14] and for the felony offense of possessing a criminal instrument. This scenario was reenacted three times in the next two weeks,[15] the only variation being that, on the last occasion, the person arrested was not Richard Dexter but Wayne Walker, a theater employee.
 
 
 16
 Dexter sued in federal court, seeking an injunction against Ted Butler, Bexar County's Criminal District Attorney, and Emil Peters, San Antonio's Police Chief. The district court ruled the confiscation of the theater's projector bad-faith harassment under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), because a film projector is clearly not a "criminal instrument" within the meaning of section 16.01, a device especially contrived for criminal purposes. The court also found bad faith in the repeated seizures of the theater's film; these were held to have contravened the Supreme Court's decision in Heller v. New York, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973). Having made these determinations, the district judges enjoined all felony prosecutions against Dexter.
 
 
 17
 Simultaneous appeals were taken here and to the Supreme Court. The Court, concluding that the case had not warranted a three-judge panel because the district court had not questioned the constitutionality of any statute, vacated the lower court's judgment, allowing entry of a new decree and perfection of an appeal to this court. The parties later agreed to appeal from the original judgment in order to save time.[16]
 
 
 18
 The district court granted relief in a matter ordinarily confined to state judicial processes. See Younger v. Harris, 401 U.S. at 44-45, 91 S.Ct. at 750-51. The appropriateness of that action depends upon whether appellants were guilty of "harassment or prosecutions . . . in bad faith without hope of obtaining a valid conviction." Perez v. Ledesma, 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1971). In deciding this question we turn first to the seizure of Fiesta Theater's projector.
 
 
 19
 Section 16.01 of the Texas Penal Code creates the felony offense of possessing a "criminal instrument" which the statute defines as "anything that is specially designed, made, or adapted for the commission of a crime." As the lower court noted, the statute obviously applies to such items as jimmies and safecracking tools, the possession of which unmistakably indicates that criminal conduct is afoot. The correctness of this interpretation is confirmed by the following portion of the "Practice Commentary" that accompanies section 16.01:
 
 
 20
 (The statute) aims at terminating incipient criminal activity, the existence of which is indicated by conduct involving a "criminal instrument." The mere possession or manufacture of things specially designed for the purpose of accomplishing a criminal objective is strong evidence of criminal intent. The instrument must be specially designed, made, or adapted for the commission of an offense, however; things frequently used in a crime, but which have common, lawful uses, are excluded from the purview of Section 16.01 because possession of such things alone, is conduct too ambiguous for the imposition of the criminal sanction.
 
 
 21
 (emphasis in original). Relying on the above commentary,[17] the district court read section 16.01 as clearly inapplicable to film projectors, which accommodate lawful movies as easily as obscene ones. Appellants respond that a projector has no lawful use when it carries a reel containing an obscene film. With this argument we cannot agree. Section 16.01 punishes criminal intent, and it is possession of an obscene movie that evinces an intent to display illegal material; whether one also has a projector is irrelevant. This point is underscored by article 18.18 of the Texas Code of Criminal Procedure, which dictates destruction of any "criminal instrument," as that term is defined in the Penal Code. This provision has its purpose in preventing criminal acts, a goal hardly advanced by junking theater projectors.
 
 
 22
 The seizure of Fiesta Theater's projector provides substantial support for the district court's finding of harassment and prosecution in bad faith. The multiplicity of the seizures dispels the likelihood of an honest mistake to the same extent that the language of section 16.01 must have dispelled any hope of obtaining Dexter's conviction. What makes this case an even more compelling one is the district attorney's failure to seek grand jury indictments on the felony charges against Dexter, which has frustrated prompt adjudication of the propriety of state efforts to curb speech.[18] See Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). This prosecutorial inaction also implies that law enforcement officials recognized they were acting illegally and knew they could not obtain convictions on the felony charges.
 
 
 23
 Appellants have attempted to explain their neglect in seeking grand jury indictments by blaming the district court's pretrial restraining order. This seemingly interminable order, which we can hardly call "temporary" since it was successively extended for 339 days,[19] originally enjoined Butler and Peters "from further seizures of the film 'Deep Throat' at the Fiesta Theater, San Antonio, Texas, and from arresting plaintiff (Dexter) or employees of said theater, for so long as 'Deep Throat' is showing at the Fiesta Theater." Appellants argue that securing indictments against Dexter would necessarily have entailed arresting him in violation of the court's restraining order because (1) under Texas law a capias must issue upon a grand jury indictment, and (2) Dexter's absence from the state required his arrest and extradition for trial. But the obvious design of the original restraining order was to prevent further efforts by law enforcement officials to halt the exhibition of "Deep Throat." Read in context, the order's prohibition against arresting Dexter meant that the police were to cease their raids upon the theater; it did not prevent the district attorney from taking whatever actions were necessary to carry out Dexter's prosecution. This interpretation of the order is borne out by the transcript of a conference that occurred on August 12, 1974, between both parties to this suit and Judge Singleton, the managing judge of the district court. In that conference Judge Singleton informed both the defense and the prosecution that the court would not enjoin prosecution of pending state cases.[20] This was reiterated shortly thereafter in the trial court's order of September 6, which superseded its original restraining order. The latter order retained the injunction against further arrests of Dexter but expressly provided that "no pending state criminal prosecutions are enjoined and the State is free to bring to trial and try any such cases."
 
 
 24
 Even had the district attorney been in doubt about the scope of the original restraining order, we would still affirm the three-judge panel's finding of bad faith because Dexter's indictment would not have necessitated his arrest. Article 23.03(a) of the Texas Code of Criminal Procedure clearly makes issuance of a capias unnecessary when the indictee is under bond, as Dexter had been ever since his first arrest.[21] As for Dexter's alleged absence from the state, we fail to see how his flight would have prevented the district attorney from obtaining indictments against him, although it may have precluded an immediate trial. In any event, appellants have offered so little proof of Dexter's alleged out-of-state excursion that we cannot determine its duration or even whether it in fact occurred.[22] All we do know is that Dexter was arrested during the third raid on the Fiesta Theater and that he personally appeared at the trial of his misdemeanor charges, which began on November 11, 1974, four days before the district court heard arguments in this case. Dexter's whereabouts between these two dates are not shown with any clarity. Moreover, the record makes it appear very possible that the district attorney's office first received information about Dexter's absence after it had already learned the district court did not intend to enjoin prosecution of charges pending against Dexter.[23] If so, Dexter's flight could not have weighed in the decision whether to proceed with the prosecution of his felony charges.
 
 
 25
 The trial court's finding of bad-faith harassment is further corroborated by the repeated seizings of the film "Deep Throat." Assuming for the moment that appellants could have temporarily barred the film's exhibition following the initial adversary hearing held at the theater, we fail to see why the district attorney did not order a single proceeding, the stated purpose of which was to determine whether "Deep Throat" should be banned until a jury determination of the film's obscenity. Instead, appellants repeatedly confiscated the film, following hearings whose only avowed purpose was to decide whether police could seize evidence of a reported crime and arrest a reported misdemeanant. This conduct strongly suggests an intent to harass. Cf. Tyrone, Inc. v. Wilkinson, 410 F.2d 639, 642 (4th Cir.), cert. denied, 396 U.S. 985, 90 S.Ct. 478, 24 L.Ed.2d 449 (1969). But see Inland Empire, Inc. v. Morton, 365 F.Supp. 1014 (C.D.Cal.1973).[24]
 
 
 26
 Having found ample grounds for affirming the trial court's holding, we need not examine the question whether appellants' repeated seizures of Fiesta Theater's film contravened the Supreme Court's decision in Heller v. New York.[25] Nonetheless, since this case presents issues representative of the twenty cases consolidated before the three-judge court, we believe a brief discussion is appropriate.
 
 
 27
 Heller contains the Supreme Court's latest discussion of the necessity of holding an adversary hearing before seizing an allegedly obscene film.[26] The crux of the Heller opinion is this statement:
 
 
 28
 If such a seizure (of film solely for the purpose of preserving evidence) is pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party, the seizure is constitutionally permissible. In addition, on a showing to the trial court that other copies of the film are not available to the exhibitor, the court should permit the seized film to be copied so that showing can be continued pending a judicial determination of the obscenity issue in an adversary proceeding. Otherwise, the film must be returned.
 
 
 29
 413 U.S. at 493-94, 93 S.Ct. at 2795 (footnotes omitted). Thus, the Court in Heller held that an adversary hearing need not precede the seizure of a film, if the seizure will not significantly interfere with the film's exhibition. The district court in this case concluded, correctly, that appellants' persistent seizures of Fiesta Theater's film were a significant restraint on the continued exhibition of "Deep Throat" and then ruled that a course of seizures such as this was invalid absent a prior adversary hearing. Since the lower court found that the probable cause hearings conducted at the theater were not "adversary hearings," it therefore declared the seizures unlawful.
 
 
 30
 Language in the district court's opinion suggests it believed that a film cannot be banned even temporarily before a trial on the merits.[27] If this is what the court meant to say, we do not agree, for in Heller the Court clearly contemplated pretrial adversary hearings. See 413 U.S. at 490, 93 S.Ct. at 2793-94. Moreover, in the recently affirmed case of Freedman v. Maryland, supra,[28] the Supreme Court held that a film's exhibition can be temporarily restrained even without a prior adversary hearing if specific procedural safeguards are observed. Since the Heller Court discussed Freedman approvingly,[29] we must conclude that a temporary ban on a film is permissible as long as there is the requirement of a prompt adversary hearing at the state's initiation.[30] Two other circuits agree with our reading of Heller. In United States v. Pryba, 163 U.S.App.D.C. 389, 502 F.2d 391 (1974), cert. denied, 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975), the D.C. Circuit stated that pre-seizure hearings are necessary when large quantities of allegedly obscene material are confiscated for the sole purpose of destruction but expressly sanctioned post-seizure hearings in other cases. 502 F.2d at 405. And in G. I. Distributors, Inc. v. Murphy, 490 F.2d 1167 (2d Cir. 1973), cert. denied, 416 U.S. 939, 94 S.Ct. 1941, 40 L.Ed.2d 290 (1974), the Second Circuit, speaking through Judge Lumbard, upheld a prehearing seizure of 19,000 copies of publications because the state had conducted an adversary hearing on the morning following the confiscation.[31] Judge Lumbard specifically rejected the argument that the Heller opinion "condemned all prehearing seizures, except those in which a limited number of copies of the allegedly obscene materials are seized solely for evidentiary purposes." 490 F.2d at 1168.
 
 
 31
 Finally, we turn to the lower court's ruling that the adversary hearings afforded Dexter were constitutionally insufficient. In response to this finding, we wish to restate established law. Adversary hearings, in the context of determining probable obscenity, need not be full-dress trials, see Tyrone, Inc. v. Wilkinson, 410 F.2d at 642; Sims v. Dial,350 F.Supp. 747 (W.D.Tex.1972); Miske v. Spicola, 314 F.Supp. 962 (M.D.Fla.1969), although it is now axiomatic that hearings must "focus searchingly on the question of obscenity." Marcus v. Search Warrants, 367 U.S. 717, 737, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961). The Supreme Court's decision in Heller v. New York gives perhaps more concrete guidance by likening an adversary proceeding to a hearing on a pretrial motion, 413 U.S. at 490-91, 93 S.Ct. at 2794, which implies notice and an opportunity to be heard as minimum requirements. We do not understand the Heller Court, however, to prescribe identical procedures for adversary hearings on both pretrial motions and questions of probable obscenity. One difference between these types of hearings is that a proceeding to determine probable obscenity may properly be held on rather short notice, since those who exhibit films of questionable legality should be prepared to defend their offerings within a relatively brief period of time. Braha v. Texas, 319 F.Supp. 1331 (W.D.Tex.1970). In viewing these considerations, we believe that the hearings conducted at the Fiesta Theater substantially approximated adversary hearings, although we do not reach the precise factual question of their sufficiency. Dexter was given notice[32] and an opportunity to be heard on the question of obscenity. He was advised that he could bring counsel to the proceedings and, during the July 28 hearing, was even encouraged to do so. Dexter was also invited to cross-examine the testifying officer and to introduce evidence. At least one reason why the adversary hearings appear to have been rather summary is that Dexter did not fully participate in them. Obviously, a theater operator cannot object to an insufficiency which is of his own making in a hearing. See United States v. Pryba, 502 F.2d at 406. Cf. Heller v. New York, 413 U.S. at 490-91, 93 S.Ct. at 2794.
 
 
 32
 The judgment of the district court is AFFIRMED.
 
 III. ATTORNEYS' FEES
 
 33
 Both Dexter and King Arts seek a remand for a determination and award of costs and attorneys' fees, the latter assessment being authorized by the Attorney's Fees Award Act of 1976, Pub.L. 94-559, 90 Stat. 2641 (1976), which revised 42 U.S.C. § 1988 to permit awards of legal expenses to prevailing parties in suits brought under the Civil Rights Acts, 42 U.S.C. §§ 1981-86.[33] King Arts has not prevailed and is, of course, not entitled to such relief. We remand Dexter's case with directions for the trial court[34] to set reasonable attorneys' fees in accordance with the standards set forth in Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir. 1974), and reaffirmed in Rainey v. Jackson State College, 551 F.2d 672 (5th Cir. 1977). Although we have discretion to award costs and fees arising out of an appeal to this court, see Moten v. Bricklayers International Union, 177 U.S.App.D.C. 77, 543 F.2d 224, 240 (1976); Globe Life & Accident Insurance Co., 402 F.2d 295 (5th Cir. 1968), considerations of judicial economy call for the district court to determine the total award in this case, see Panior v. Iberville Parish School Board, 543 F.2d 1117, 1120 (5th Cir. 1976), especially since an evidentiary hearing may be necessary, see Moten v. Bricklayers International Union, supra at 240.
 
 
 34
 Appellants Butler and Peters contend that they are not subject to such awards because this case was pending when Congress revised section 1988, but we have disposed of that contention in Rainey v. Jackson State College, supra. As the Rainey court observed, the legislative history of the Attorney's Fees Act makes plain Congress' intent to allow fee awards in pending cases unless the awards are "manifestly unjust."[35] 551 F.2d at 676. We do not consider them to be so in this case.
 
 
 35
 A more difficult question is, against whom can the district court direct its award? Again, we consult the legislative history that accompanies Congress' revision of section 1988:
 
 
 36
 As with cases brought under 20 U.S.C. § 1617, the Emergency School Aid Act of 1972, defendants in these cases (inter alia, cases brought under the Civil Rights Acts, 42 U.S.C. §§ 1980-86) are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity,7 from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party).
 
 
 37
 S.Rep. No. 94-1011, 94th Cong., 2d Sess. 5 & n. 7, reprinted in (1976) U.S.Code Cong. & Ad.News pp. 5908, 5913 (footnote omitted). Although, as the above passage makes clear, Congress intended to lift the veil of immunity from state and local governments to this limited degree,[36] the last sentence in the passage makes it equally clear that the Attorney's Fees Award Act does not change judicially established rules governing individual immunity for unconstitutional acts committed by a person acting in official capacity. Thus, if the district court decides to award fees against persons in their individual capacities, it must respect the absolute immunity from money damages enjoyed by prosecutors, see Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), as well as the qualified, good-faith immunity possessed by other government officials, see Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Scheur v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Consequently, any award of fees against individuals implicated in this case may require a hearing by the district court to develop facts not contained in the record, such as the scope and nature of the prosecutor's actions.[37] Likewise, awarding fees against city and state governments may require a hearing to determine such facts as whether city police were operating under the orders of state officials.
 
 
 38
 Accordingly, the lower court's judgment in King Arts is REVERSED, and decision is here RENDERED in accordance with our opinion. In Butler we AFFIRM and REMAND for further proceedings consistent with the above instructions.
 
 
 39
 THORNBERRY, Circuit Judge, dissenting in part, concurring in part:
 
 
 40
 In Part I of its opinion, the majority avoids what it admits to be "serious first amendment questions" by creating legislative intent from non-existent legislative history and by taking an abstruse view of relevant Supreme Court cases. Because a plain reading of the applicable Texas statutes and of those cases calls for a result contrary to that reached by the majority, I respectfully dissent. Moreover, while I concur in the result reached in Part II of the opinion, I cannot subscribe to the majority's use of a judicial shotgun when a small-caliber rifle would have sufficed.[1]
 
 
 41
 Taking the two portions in reverse order, I agree with the majority that bad-faith harassment is indeed "ample grounds for affirming the trial court's holding" in Dexter v. Butler. Ante at 1297. I would go no further, simply because such an excursion requires the Court to "decide" issues not essential to the disposition of the case before it.[2]
 
 
 42
 Part I of the opinion, however, necessitates more elaborate discussion. Article 4666 of the Texas statutes provides that upon "reliable information" that a nuisance exists, the attorney general, district attorney, or county attorney shall bring suit in the name of the State to abate or enjoin the nuisance. If the State is successful, there follows, as the majority aptly describes it, the "rather draconian remedy" of closing the premises for one year, unless the owner posts a penal bond of not less than $1,000 or more than $5,000 against future nuisance law violations. Article 4667, as amended in 1973, defines the commercial manufacture, distribution or exhibition of obscene material as a "public nuisance" and also sets forth a list of other nuisances, including gambling, prostitution, and bull fighting. The statute further provides that such activities "shall be enjoined at the suit of either the State or any citizen thereof."
 
 
 43
 In reversing the district court in King Arts Theatre, Inc. v. McCrea, the majority concludes that the one-year closing remedy provided in Article 4666 is inapplicable to obscenity and that the injunctive remedy under Article 4667 is "the exclusive procedure for abating obscene exhibitions as nuisances." Ante, at 1290. This strained interpretation ignores the plain language of the two statutes, and the majority is forced to support its conclusion with suppositions about what the Legislature may have intended.[3]
 
 
 44
 In my view, Articles 4666 and 4667, taken together, allow the state to close, for one year, a theatre that has exhibited obscene films. Unless the bond is posted, the showing of any motion picture is punishable by contempt of court; thus, future conduct which may fall within the purview of the First Amendment is absolutely prohibited after a finding of undesirable and unprotected present conduct. It was precisely this practice that was condemned by the Supreme Court in the landmark case of Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Of course, the theatre owner may post the bond and show films, but he forfeits that bond if one of the films he has selected is deemed obscene. The line between obscenity and protected speech is an extremely fine one, so fine that it is "dim and uncertain." Bantam Books v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). As Justice Black pointed out:
 
 
 45
 (N)o person, not even the most learned judge much less a layman, is capable of knowing in advance of an ultimate decision in his particular case by this Court whether certain material comes within the area of "obscenity."
 
 
 46
 Ginzburg v. United States, 383 U.S. 463, 480-81, 86 S.Ct. 942, 952, 16 L.Ed.2d 31 (1966) (Black, J., dissenting). This particular dilemma has led Justice Brennan to observe:
 
 
 47
 The essence of our problem in the obscenity area is that we have been unable to provide "sensitive tools" to separate obscenity from other sexually oriented but constitutionally protected speech, so that efforts to suppress the former do not spill over into suppression of the latter.
 
 
 48
 Paris Adult Theatre v. Slaton, 413 U.S. 49, 79-80, 93 S.Ct. 2628, 2645, 37 L.Ed.2d 446 (1973) (Brennan, J., dissenting). Few of us, perhaps only Justice Stewart and Kurt Vonnegut's fictional Senator Rosewater,[4] can escape from this definitional quagmire, and this statutory scheme obviously encourages a theatre owner to steer wide of the danger zone by avoiding borderline films that are nonetheless protected under the First Amendment. This is self-censorship, a particularly subtle and most insidious form of censorship. Cf. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
 
 
 49
 Even more troubling is the majority's conclusion that the injunctive procedure contained in Article 4667 satisfies the requirements of Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), reaffirmed in Southeastern Productions v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). The essence of these cases, as the district court pointed out, is that initial suppression of allegedly obscene material is permissible only for a brief, fixed period of time until a judicial determination is made and that final suppression is allowable only after a judicial determination of obscenity in an adversary context. The Texas injunction procedures, which would apply to an action brought under Article 4667, do not provide for a short, fixed period of time in which a final determination of obscenity can be made and are thus inadequate under Freedman. As the district court wrote:
 
 
 50
 Pursuant to (Rules 680-693a of the Texas Rules of Civil Procedure), the state could obtain a temporary restraining order lasting up to ten days, ex parte. As soon as possible, within that ten days, however, a hearing on a temporary injunction is obtainable. The temporary injunction is not a final adjudication on the merits but, once it is obtained, there is no provision for treating the (obscenity) case any differently from any other civil case. The lack of a provision for a swift final adjudication on the obscenity question raises serious doubts of the constitutional usability of the injunction process in Texas for an obscenity situation.
 
 
 51
 404 F.Supp. at 46.
 
 
 52
 The majority attempts to distinguish this process from Freedman by labeling Freedman as an "administrative" case in which the Court was dealing with a "tentative administrative determination." That is a distinction without a difference, for the Court's overriding concern in Freedman was the evil caused by the state's indefinite suppression of potentially protected speech without a judicial determination of whether the material is obscene. Here the evil lies in the fact that, under Texas procedure, the temporary injunction is tentative not a ruling on the merits and Freedman requires procedural safeguards that include, inter alia, the assurance of prompt judicial review on the merits.
 
 
 53
 Because I would affirm the district court's holding that the statutory scheme embodied in Articles 4666 and 4667 are unconstitutional insofar as they concern obscenity, I respectfully dissent from Part I of the majority opinion. I concur in the result reached in Part II, and, with the exception stated in footnote 1 of this opinion, I concur in Part III.
 
 
 54
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 
 55
 Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, and RUBIN, Circuit Judges.
 
 BY THE COURT:
 
 56
 A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,
 
 
 57
 IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.
 
 
 
 *
 Of
 United States Court of Customs and Patent Appeals, sitting by designation.
 
 
 [1]
 The third was not appealed
 
 
 [2]
 The district court asserts that this letter stated that the lease termination was at the county attorney's suggestion. 404 F.Supp. at 38. As the letter appears in the record before us, we find no such representation; the letter states only that the termination was to avoid the inconvenience and embarrassment of joinder as a defendant in a suit to enjoin the showing of pornographic films
 
 
 [3]
 Tex.Rev.Civ.Stat.Ann. art. 4667(a)(3) (Supp.1976):
 (a) The habitual use . . . of any premises . . . for any of the following uses shall constitute a public nuisance and shall be enjoined at the suit of either the State or any citizen thereof;
 (3) For the commercial manufacturing, commercial distribution, or commercial exhibition of obscene material . . . .
 
 
 [4]
 Whenever the Attorney General, or the district or county attorney has reliable information that such a nuisance exists, either of them shall file suit in the name of this State in the county where the nuisance is alleged to exist against whoever maintains such nuisance to abate and enjoin the same. If judgment be in favor of the State, then judgment shall be rendered abating said nuisance and enjoining the defendants from maintaining the same, and ordering that said house be closed for one year from the date of said judgment, unless the defendants in said suit, or the owner, tenant or lessee of said property make bond payable to the State at the county seat of the county where such nuisance is alleged to exist, in the penal sum of not less than one thousand nor more than five thousand dollars, with sufficient sureties to be approved by the judge trying the case, conditioned that the acts prohibited in this law shall not be done or permitted to be done in said house. On violation of any condition of such bond, the whole sum may be recovered as a penalty in the name and for the State in the county where such conditions are violated, all such suits to be brought by the district or county attorney of such county
 
 
 [5]
 Compare 106 Forsyth Corp. v. Bishop, 362 F.Supp. 1389 (M.D.Ga.1972), aff'd, 482 F.2d 280 (5th Cir. 1973), cert. denied, 422 U.S. 1044, 95 S.Ct. 2660, 45 L.Ed.2d 696 (1975), finding no first amendment violation in the revocation of a movie theater's license for up to twelve months after a determination at a prior adversary hearing that obscene films had been shown, and Grove Press, Inc. v. Flask, 326 F.Supp. 574 (N.D.Ohio 1970) (three-judge court), vacated and remanded for further consideration in light of intervening decisions, 413 U.S. 902, 93 S.Ct. 3026, 37 L.Ed.2d 1013 (1973), upholding state nuisance statutes which provided for voiding of leases and closing of establishments for up to one year after a full adversary hearing and determination that obscene movies had been exhibited, with Avon 42nd Street Corp. v. Myerson, 352 F.Supp. 994, 998 (S.D.N.Y.1972) (dictum) ("To permit the suspension of operation of a theatre on the basis of a prior conviction even for obscenity, amounts to an unconstitutional suppression of protected freedom of expression.")
 
 
 [6]
 Indeed, we find no indication in the record that the county attorney contemplated any remedy other than an injunction against the showing of obscene movies. So far as we can tell, the question of the one-year abatement was introduced by King Arts' pleadings, not by the county attorney
 
 
 [7]
 Any hotel, rooming house or boarding house, country club, garage, rent car stand or other place to which the public commonly resort for board or lodging or commonly congregate for business or pleasure, where intoxicating liquors are kept, possessed, sold, manufactured, bartered or given away, or where intoxicating liquors are furnished to minors or to students of any educational institution, or where persons habitually resort for the purpose of prostitution or to gamble as prohibited by the Penal Code, is hereby declared to be a common nuisance. Any person who knowingly maintains such a place is guilty of maintaining a nuisance
 
 
 [8]
 Which was also amended in 1973. The 1973 amendments to both articles 4664 and 4667 were part of a much larger bill enacting a new Texas Penal Code
 
 
 [9]
 Miller v. California, 413 U.S. 15, 23, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)
 
 
 [10]
 For the same reasons the district court's understandable concern about article 4665, which elevates proof that prohibited acts are committed in a place to the status of prima facie evidence that the proprietor knowingly permitted them to occur and permits proof that a house is such a nuisance by evidence of its general reputation, was similarly misplaced. Like article 4666, article 4665 seems to look to article 4664 speaking, for example, of "proof that any of said prohibited acts are committed in any of said places " and was enacted contemporaneously with article 4664 as part of the same bill. Under our reading, article 4665 is unavailable in actions to enjoin the exhibition of obscene materials and need not be considered by us
 
 
 [11]
 Under Texas law the injunctive order must "be specific in terms" and "describe in reasonable detail . . . the act or acts sought to be restrained . . . ." Tex.R.Civ.P. 683. An order which enjoins the exhibition of obscene material, as the term is defined in the Penal Code, and provides no further guidelines is invalid under Texas Rule 683, wholly apart from first amendment considerations. Richards v. State, 497 S.W.2d 770, 778 (Tex.Civ.App. Beaumont 1973, no writ)
 
 
 [12]
 As it happens, these rules primarily Texas Rules of Civil Procedure 680 and 681 are copied, with minor textual changes not relevant here, from Federal Rule 65. This circumstance, while of course it does not render the Texas rules inviolate, does lend a certain extension and moment to the court's remarks expressing doubt about their propriety
 
 
 [13]
 It is true that in Freedman the Court spoke of a "final judicial determination," though the context is a reference to "(a)ny restraint imposed in advance of" such a determination. 380 U.S. at 59, 85 S.Ct. at 739. But on the preceding page, the phrasing is "only a procedure requiring a judicial determination suffices to impose a valid final restraint." And on the page following, the phrase is merely "prompt judicial determination."
 
 
 [14]
 Section 43.23 of the Texas Penal Code sets forth the offense of commercial obscenity as follows:
 (a) A person commits an offense if, knowing the content of the material:
 (1) he sells, commercially distributes, commercially exhibits, or possesses for sale, commercial distribution, or commercial exhibition any obscene material;
 (c) An offense under this section is a Class B misdemeanor unless committed under Subsection (a)(3) of this Section, in which event it is a Class A misdemeanor.
 
 
 [15]
 Arrests were made on June 24, June 28, July 2 and July 6, 1974
 
 
 [16]
 Appellants have challenged the composition of the three-judge panel because the judge who first heard the request for injunctive relief was not included on the panel as 28 U.S.C. § 2284 requires. This question was mooted when the Supreme Court vacated the three-judge court's decision and the parties agreed to appeal from the existing judgment rather than waiting for a new decree
 
 
 [17]
 Appellants have objected that the Practice Commentary is entitled to little weight since it lacks the status of law. The objection would have more force if the commentary did more than restate the obvious meaning of § 16.01 and if the Texas Court of Criminal Appeals had not recently approved of the manner in which the lower court interpreted the statute. See Fronatt v. State, 543 S.W.2d 140 (Tex.Crim.App.1976)
 
 
 [18]
 Appellants cite Dexter's motions for continuance in his misdemeanor trial as evidence that he was not anxious for a determination of his guilt or innocence in state court. We fail to see how these dilatory motions prove that Dexter would not have been quick to resist felony charges, something we will never know because of the district attorney's failure to obtain felony indictments
 
 
 [19]
 The first restraining order, quoted in the text, was issued by Judge Singleton following an ex parte hearing conducted on July 29, 1974. Twelve days later the order was extended, and in an August 12 conference Judge Singleton announced that the restraining order would be successively extended, regardless of whether additional, written orders were decreed. Finally, on September 6, 1974, the court superseded its original restraining order with another one, which was to remain in effect pending disposition of the case
 
 
 [20]
 The following conversation took place at the hearing:
 MR. BURRIS: Your honor, could I ask one question? Now, your prior temporary restraining order has not been in such language as to restrain us from prosecuting our present criminal cases. It's been an injunction against further arrests and seizures of film.
 THE COURT: I don't think I am going to enjoin you from prosecuting these pending criminal cases . . . .
 
 
 [21]
 Art. 23.03 of the Code of Criminal Procedure reads as follows:
 (a) A capias shall be immediately issued by the district clerk upon each indictment for felony presented, or upon the request of the attorney representing the State, the summons shall be issued by the district clerk, and shall be delivered by the clerk or mailed to the sheriff of the county where the defendant resides or is to be found. A capias or a summons need not issue for a defendant in custody or under bond.
 
 
 [22]
 Appellants offer three items of evidence to prove that Dexter fled the state. First, they adduce an affidavit of the Chief of the Special Crimes Division of the Bexar County District Attorney's Office. This affidavit merely mentions a statement by Dexter's attorney that his client was out of the state. Second, appellants produce the transcript from a hearing on one of Dexter's continuance motions in his misdemeanor trial. In that hearing Dexter's newly retained counsel stated he did not know where his client was. Third, and least persuasive, appellants advert to that portion of the transcript from the August 12 conference with Judge Singleton in which defense counsel, Mr. Burris, describes Dexter as a "fugitive out (sic) Memphis, Tennessee."
 
 
 [23]
 Dexter's misdemeanor trial was originally set for September 16, 1974. From the record, it appears that the district attorney's office first concluded that Dexter was absent from the state when a summons for his appearance at the misdemeanor trial was returned unserved. This suggests that the prosecutor first believed that Dexter had fled the state long after the August 12 pretrial conference in which Judge Singleton advised that the restraining order did not prevent prosecution of pending cases, and perhaps even after the order of September 6, which removed any doubt on that score
 
 
 [24]
 The district court in Inland Empire refused to enjoin repeated seizure of the film "Deep Throat," noting that each showing of the motion picture was a separate offense "(j)ust as a new offense subject to arrest and seizure on a valid warrant is committed every day when a putative Defendant purchases other kinds of contraband such as heroin, cocaine or other narcotics, and then possesses, distributes and sells them." 365 F.Supp. at 1017. The seizures at issue in Inland Empire were made pursuant to search warrants; adversary hearings did not precede the issuance of the warrants nor did they promptly follow
 In disagreeing with the analysis of the court in Inland Empire, we observe the following statement:
 It is no answer to say that obscene books are contraband, and that consequently the standards governing searches and seizures of allegedly obscene books should not differ from those applied with respect to narcotics, gambling paraphernalia and other contraband.
 A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 211-12, 84 S.Ct. 1723, 1726, 12 L.Ed.2d 809 (1964).
 
 
 [25]
 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973)
 
 
 [26]
 Twice the Supreme Court has declined to decide whether an adversary hearing must precede the seizure of obscene material pursuant to a search warrant. See McGrew v. City of Jackson, 401 U.S. 987, 91 S.Ct. 1221, 28 L.Ed.2d 525 (1971), vacating 307 F.Supp. 754 (S.D.Miss.1970) (holding pre-seizure hearing unnecessary); Hosey v. City of Jackson, 401 U.S. 987, 91 S.Ct. 1221, 28 L.Ed.2d 525 (1971), vacating 309 F.Supp. 527 (S.D.Miss.1970) (holding pre-seizure hearing unnecessary). Both cases were vacated and remanded in light of Younger v. Harris, supra, and Samuels v. Mackel, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971)
 In yet another case the Supreme Court avoided deciding whether the first amendment permits issuance of an ex parte temporary injunction against the sale or display of obscene material when an adversary hearing is required within two days. ABC Books, Inc. v. Benson, 401 U.S. 988, 91 S.Ct. 1228, 28 L.Ed.2d 525 (1971), vacating 315 F.Supp. 695 (M.D.Tenn.1970) (holding injunction proper). This case was also vacated and remanded in light of Younger v. Harris, supra, and Samuels v. Mackel, supra. The Court later vacated this case again, 413 U.S. 904, 93 S.Ct. 3028, 37 L.Ed.2d 1015 (1973), this time in light of Heller v. New York, supra, and its companion cases: Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Paris Adult Theater I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); Kaplan v. California, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); United States v. Twelve 200-foot Reels of Super 8mm Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); Roaden v. Kentucky, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973); Alexander v. Virginia, 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973).
 
 
 [27]
 In commenting upon the sufficiency of the probable cause hearings conducted at the Fiesta Theater, the court stated:
 The fact that the magistrate notified the attorney and gave him the opportunity to appear at a "hearing" which consisted of nothing more than the testimony of the police officer and the viewing of the film (sic) does not transform San Antonio's procedures into an adversary hearing, the results of which would have the force and effect of a final adjudication of obscenity.
 
 
 [404]
 F.Supp. at 49 (emphasis added)
 
 
 [28]
 See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)
 
 
 [29]
 413 U.S. at 489-90, 93 S.Ct. at 2793. See also McKinney v. Alabama, in which the Court cited Freedman and Heller in tandem, describing them as cases establishing procedures sensitive to first amendment freedoms. 424 U.S. 669, 673, 96 S.Ct. 1189, 1193, 47 L.Ed.2d 387 (1976)
 
 
 [30]
 Despite Freedman v. Maryland, it is still theoretically possible to argue that an adversary hearing must always precede the imposition of even a temporary ban on a film. The Freedman case can be distinguished as involving a temporary restraint imposed before a film is exhibited; when a film is seized during its exhibition, one can contend that a greater procedural protection should be provided since greater disruption of a theater's operations ensues. On several occasions the Supreme Court has given weight to business considerations in determining the validity of procedures by which film exhibitions are stopped. See Roaden v. Kentucky, 413 U.S. 496, 503-04, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757 (1973). Specifically has the Court noted a theater operator's need for planning a schedule of his feature films. See Freedman v. Maryland, 380 U.S. at 61, 85 S.Ct. at 740. Nevertheless, this argument seems foreclosed by the Heller Court's express approval of Freedman in the context of discussing procedures that must be followed when law enforcement officials seize films then being exhibited
 A further argument can be made supporting the proposition that adversary hearings must be held before any restraint is imposed on a film's exhibition. In A Quantity of Copies of Books v. Kansas, supra, the Court held that a judicial determination of obscenity in an adversary proceeding is necessary before officials can seize large quantities of books for the sole purpose of destroying them. See also Marcus v. Search Warrants of Property, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). In Heller v. New York the Court, through Chief Justice Burger, reaffirmed A Quantity of Books, noting its applicability in any case involving a "large-scale seizure of books, films, or other materials presumptively protected under the First Amendment." 413 U.S. at 491, 93 S.Ct. at 2794. In the case that next appears in Volume 413 of the United States Reports, Roaden v. Kentucky, supra, the Chief Justice, again speaking for the Court, stated that "(s)eizing a film then being exhibited to the general public presents essentially the same restraint on expression as the seizure of all the books in a book store." 413 U.S. at 504, 93 S.Ct. at 2801. Juxtaposing these passages, one can argue that A Quantity of Books applies to any restraint placed upon a film then being shown. What this argument fails to take into account is the Heller Court's emphasis on the purpose of the seizures in both A Quantity of Books and Marcus v. Search Warrants namely, the destruction of the seized material. A seizure for this purpose would require a prior adversary hearing, since a hearing held after the material's destruction would be useless. The same is not true of a hearing promptly following the imposition of a temporary restraint on a film's exhibition. Cf. United States v. Pryba, 163 U.S.App.D.C. 389, 502 F.2d 391, 405 (1974), cert. denied, 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975) (noting that seizure "solely for the purpose of destruction" demands greater procedural safeguards than does seizure "with a view to absolute suppression"); G. I. Distributors, Inc. v. Murphy, 490 F.2d 1167 (2d Cir. 1973), cert. denied, 416 U.S. 939, 94 S.Ct. 1941, 40 L.Ed.2d 290 (1974) (upholding prehearing seizure of 19,000 copies of publications pending adversary hearing on the following morning).
 
 
 [31]
 The Murphy case reinstated the court's former decision, which the Supreme Court had vacated and remanded in light of Heller v. New York and its companion cases. See 413 U.S. 913, 93 S.Ct. 3056, 37 L.Ed.2d 1033 (1973)
 
 
 [32]
 Dexter was given notice one-half hour before the hearing that took place on June 28 and one hour before the July 2 proceeding. On the first occasion the presiding magistrate expressed willingness to delay the hearing if Dexter so desired. We do not determine the factual question whether Dexter received adequate notice on either of these dates
 
 
 [33]
 The relevant portion of revised § 1988 reads as follows:
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 [34]
 Since the parties agreed to appeal from the district court judgment, and since costs must be determined with reference to what happened at the trial level, we believe that the managing judge of the three-judge court should hear this case on remand, even though the Supreme Court vacated the panel's judgment for want of jurisdiction
 
 
 [35]
 The House Report to the Act stated that, "(i)n accordance with applicable decisions of the Supreme Court, the bill is intended to apply to all cases pending on the date of enactment as well as all future cases." H.R.Rep. No. 94-1558, 94th Cong., 2d Sess. 4, n. 6 (1976). The legislation's applicability to pending cases was also noted during the floor debates. See 122 Cong. Rec. S17,052 (daily ed. Sept. 29, 1976) (remarks of Sen. Abourezk); 122 Cong. Rec. H12,155 (daily ed. Oct. 1, 1976) (remarks of Rep. Anderson); 122 Cong. Rec. H12,160 (daily ed. Oct. 1, 1976) (remarks of Rep. Drinan); 122 Cong. Rec. H12,166 (daily ed. Oct. 1, 1976) (remarks of Rep. Ashbrook)
 
 
 FN7
 Proof that an official had acted in bad faith could also render him liable for fees in his individual capacity, under the traditional bad faith standard recognized by the Supreme Court in Alyeska (Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). See Class v. Norton, 505 F.2d 123 (2d Cir. 1974); Doe v. Poelker, 515 F.2d 541 (8th Cir. 1975)
 
 
 [36]
 Cases so holding have relied on Congress' power under the enforcement clause of the fourteenth amendment as construed in Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). See Bond v. Stanton, 555 F.2d 172 (7th Cir. 1977); Rodrigues v. Jimenez, 551 F.2d 877 (1st Cir. 1977); Rainey v. Jackson State College, supra. But see Skehan v. Board of Trustees, --- F.Supp. ---- (M.D.Pa.1977) (holding that the Attorney's Fee Award Act does not retract state immunity with sufficiently express language)
 
 
 [37]
 The Supreme Court has not resolved the thorny question whether prosecutors enjoy absolute immunity for acts other than initiating and pursuing a prosecution. See Imbler v. Pachtman, 424 U.S. at 430, 96 S.Ct. at 995
 
 
 [1]
 At this point I should add that I concur in Part III of the opinion, although in my view King Arts also is entitled to a remand for a determination of attorneys' fees
 
 
 [2]
 The majority as much as concedes that its discussion of the adversary hearing question is dictum when it states that "we do not reach the precise factual question of (the) sufficiency (of the hearing)." Ante, at 1299
 
 
 [3]
 For example, the majority states that "(p)erhaps the legislature foresaw the constitutional implications . . . and to avoid potential trenching upon the first amendment, chose to authorize only the lesser constraint of an injunction against future exhibitions of unprotected obscene matter . . . ." Ante at 1291. This is nothing more than conjecture, for as anyone familiar with Texas government is acutely aware, there is no such thing as a "legislative history" for acts of the legislature
 
 
 [4]
 Justice Stewart, of course, knows obscenity when he sees it. Jacobellis v. Ohio, 378 U.S. 184, 196-97, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). Senator Rosewater's primary accomplishment was a statute making the publication or possession of obscene materials a federal offense. The statute, Vonnegut wrote, "was a masterpiece because it actually defined obscenity." The definition: "Obscenity is any picture or phonograph record or any written matter calling attention to reproductive organs, bodily discharges, or bodily hair." K. Vonnegut, God Bless You, Mr. Rosewater 85 (Delta ed. 1965)